UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                 :

JOYSUDS, LLC,                           :

                           :

              Plaintiff,         :

                           :      22 Civ. 3781 (JPC) (OTW)

      -v-                      :

                           :      <u>OPINION AND ORDER</u>

N.V. LABS, INC. d/b/a REFORMA GROUP,  :

                           :

             Defendant.     :

                           :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff JoySuds, LLC ("JoySuds") brings this action against Defendant N.V. Labs, Inc.,

doing business as Reforma Group ("Reforma"), for breach of a supply agreement and for

negligence, gross negligence, and tortious interference related to Reforma's performance under

that agreement.  Reforma moves for judgment on the pleadings, arguing that JoySuds has failed to

state a claim for breach of contract, and that JoySuds's tort claims are duplicative of the breach of

contract claims, are barred by the economic loss doctrine, and are insufficiently pled.  Because

JoySuds has adequately alleged its breach of contract claim, Reforma's motion is denied with

respect to that claim.  But because JoySuds has failed to adequately allege a claim for tortious

interference, and because JoySuds's negligence and gross negligence claims are duplicative of the

breach of contract claims, the Court grants the motion with respect to those claims.  JoySuds is

granted leave to amend its claims in the event it is able to plead viable, non-duplicative causes of

action for negligence or gross negligence, or to plead a valid claim for tortious interference.

## I.    Background[1]

### A.    Factual Background

JoySuds acquired the branding rights to "Joy" dish detergent products in 2019.  Am. Compl. ¶ 18.  Reforma "holds itself out as an experienced and professional contract manufacturer." *See id.* ¶ 1.  On April 6, 2021, JoySuds and Reforma entered into the Supply Agreement, under which Reforma would manufacture certain Joy products and sell them to JoySuds.  *Id.* ¶¶ 1, 21, 23.  The Supply Agreement is sixteen pages long, including signature pages and exhibits, and contains many provisions not immediately relevant to Reforma's motion.  *See generally* Supply Agreement.  Below is a description of those provisions that are.

The Supply Agreement commenced on April 6, 2021 and was to continue for a two-year period, with automatic one-year renewals unless a party terminated the agreement.  *Id.* § 1.  Reforma was to provide certain "services with respect to the Products during the Term of this Agreement on a non-exclusive basis."  *Id.* § 2.  Those services include "purchase and procure raw materials to manufacture the Products," "store raw materials for the Products," "manufacture and label the Products in strict compliance" with provided specifications, "package, warehouse and store Products for pick-up by JoySuds' logistic partner," and "sell the Products to JoySuds under the terms set forth herein."  *Id.*  JoySuds was to "provide Reforma with all necessary processes, trade secrets, manufacturing know-how, and rights for Reforma to manufacture the Products."  *Id.*

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 31 ("Am. Compl."), as well as from documents incorporated by reference in or integral to the Amended Complaint, most notably the parties' Supply Agreement, Dkt. 40-2 ("Supply Agreement").  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010); *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 90 (S.D.N.Y. 2020); *see also Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

The Supply Agreement sets out the "Products" for Reforma to produce at Exhibit A. *Id.* § 3; *see also id.*, Exh. A. These Products were "to be manufactured and sold by Reforma on a non-exclusive basis and purchased by JoySuds." *Id.* § 3. Pricing would be "as mutually agreed by the Parties In Writing" and the Products would be produced "in accordance with the specification of those Products." *Id.* The Supply Agreement defines "In Writing" as "a formal amendment agreed to in writing and signed by the Parties" or "an unambiguous exchange of contemporaneous emails by individuals with authority to act on behalf of the respective Parties that explicitly state one Party's desired amendment, and the other Party's explicit agreement to the proposed amendment." *Id.*

JoySuds agreed to "provide Reforma a written rolling three-month production schedule at least fourteen (14) days prior to the beginning of each calendar month" for purchase orders. *Id.* § 4.1. The parties would then "mutually agree In Writing upon scheduled production during a particular week for the monthly volume" and Reforma would "comply with such Weekly Scheduled Production." *Id.* If Reforma could not "strictly comply with the Weekly Scheduled Production, Reforma shall immediately notify JoySuds, and Reforma and JoySuds shall use reasonable and diligent efforts to resolve the scheduling production issue." *Id.* "[U]pon delivery of each Production Plan to Reforma," JoySuds was to "purchase the Products scheduled to be manufactured and shipped during the first month of the Production Plan." *Id.* If Reforma was "unable to meet the production schedule for the first month in a Production Plan," then it was to "notify JoySuds in writing (email communication is sufficient) prior to the start of such month, and the Parties shall reasonably re-adjust the Production Plan In Writing." *Id.* In the Supply Agreement, Reforma agreed that it had "been provided with proposed forecasts for the Products from JoySuds" and "represent[ed] and warrant[ed] that it has the capacity and ability to produce

3

the Products in accordance with the Proposed Forecasts within the time and quantities set forth

therein." *Id.* § 4.2.

Pricing terms are set forth in section 5 of the Supply Agreement, titled "Price and Payment

Terms." *Id.* § 5.[2] JoySuds would "pay Reforma for the finished Products at the price set forth on

Exhibit A (the 'Base Price')." *Id.* § 5.1. Reforma would "issue invoices to JoySuds for the Base

Price which shall be paid by JoySuds net 30 days from the date the underlying JoySuds Purchase

Order is picked up at Reforma." *Id.* But

> [i]f Reforma incurs any industry-wide systemic material increase or decrease in a
> specific cost, charge or fee beyond its control of the Base Price, Reforma shall
> provide JoySuds (i) immediate notice of such material increase or decrease, and (ii)
> sufficient documentation establishing such industry-wide systemic material
> increase or decrease in costs, charge or fee beyond Reforma's control . . . . JoySuds
> shall have thirty (30) days from receipt of the documentation establishing the
> increase or decrease to review the documentation and take sufficient steps to verify
> the same. Thereafter, if there is a material increase or decrease, the parties shall
> cooperate in good faith to determine the resulting dollar-for-dollar impact of such
> increase or decrease on the Base Price, if any ("Surge Temporary Price
> Adjustment").

*Id.* § 5.2.2. Such a price increase would "not result in a permanent increase or decrease in the Base

Price; the adjustment shall only be temporary, shall be reevaluated monthly, and shall be readjusted

back to the Base Price prior to the Surge Temporary Price Adjustment once the cost, charge or fee

normalizes." *Id.*

JoySuds in turn could revise the specifications for the products manufactured by Reforma

"only with the mutual consent of both Parties (not to be unreasonably withheld by Reforma) In

Writing, and so long as JoySuds bears any and all costs associated with such changes." *Id.* § 5.3.

---

[2] The Court quotes words and phrases written in all capital letters in the Amended
Complaint and Supply Agreement in accordance with the normal capitalization rules used for
titles.

Another provision of the Supply Agreement sets forth the terms under which JoySuds would pick product up from Reforma's warehouse. *Id.* § 6.0. Reforma would "notify JoySuds of the scheduled date for production of an order as soon as such date is scheduled ('Schedule[d] Production Date') and shall use best efforts to provide such notice at least 5 days prior to the Scheduled Production Date." *Id.* "Warehouse pick-up of the Products at Reforma may be scheduled up to two business days prior to or two business days after the Scheduled Production Date." *Id.*

The Supply Agreement also addresses JoySuds's ability to purchase products from a supplier other than Reforma in the event Reforma was unable to supply the Products over a period of more than fifteen days. Titled "Alternate Supplier," section 8.2 states:

> [I]n the event Reforma is unable to supply, directly or indirectly, JoySuds for a period of more than fifteen (15) days, whether due to circumstances beyond its control, or for any other reason, JoySuds may, without limitation of any other rights or remedies JoySuds may have if such inability is due to a breach of this Agreement, purchase from a third party designated by JoySuds or manufacture for its own benefit the Products, during the remaining term of this Agreement, until such time as Reforma can resume supplying JoySuds in a timely manner with all the Products that Reforma is obligated to furnish JoySuds under this Agreement.

*Id.* § 8.2. If Reforma were "unable to supply JoySuds" for "a period of thirty (30) days, for whatever reason, then JoySuds may terminate this Agreement upon notice to Reforma." *Id.*

Several warranties provided by Reforma are relevant to this motion. Reforma warranted that "at the time of pick-up or delivery of [the] Products, the Products shall strictly conform to all Specifications, not be misbranded or adulterated and be free from defects in material and workmanship." *Id.* § 9.1(b). Reforma warranted further that "the Products shall be manufactured and labeled in strict compliance with the Specifications and in a good and workmanlike manner at quality levels consistent with industry standards." *Id.* § 9.1(c). Additionally, Reforma warranted that it "has the capacity and ability to produce the Products in the quantities and forecasts as set

forth herein." *Id.* § 9.1(i).   Reforma also warranted and represented that "in order to ensure quality of the Products" it would "perform micro testing on bulk and finished Products along with other tests such as characteristic, PH, Viscosity, Color, Odor tests," and that "each lot shall have a Certificates of Analysis (COA) which will conform with all specifications as mutually agreed to by JoySuds and Reforma to ensure quality of the products of each lot." *Id.* § 9.1(l).

Section 10 is titled "Inspection; Quality Control; Certifications; Recalls." *Id.* § 10.  It states that "JoySuds shall inspect the Products within thirty (30) days after pickup from Reforma" and that "[i]f JoySuds discovers any Non-Conformity (defined below) with the relevant purchase order, . . . JoySuds shall notify Reforma within such 30-day period, or such Product shall be deemed to be conforming, except for Latent Defects (defined below)." *Id.* § 10.1.  A "'Non-Conformity' with respect to a shipment shall mean that such shipment includes less than 90% or more than 110% of the scheduled quantity, or that more than 1% of such shipment does not comply with Reforma's warranty set forth in Section 9.1." *Id.*  Moreover, a "'Latent Defect' with respect to a shipment shall mean a Non-Conformity that could not commercially reasonably be discovered by a visual inspection on or before the date specified in this Section or any Non-Conformity that would manifest itself only after the passage of time or any Non-Conformity that would manifest itself only after the Products were used by the consumer and had been in commerce for a sufficient period of time that such Non-Conformity would become known to JoySuds, in each case that JoySuds did not find at the time of the initial inspection." *Id.*

Section 10.2 sets out the remedies available and required next steps after a Non-Conformity or a Latent Defect is identified.  First, if JoySuds "conducts such inspections and discovers any Non-Conformity and JoySuds notifies Reforma as set forth in Section 10.1" or "discovers any Latent Defect, and JoySuds notifies Reforma promptly on discovery, then upon Reforma's request,

6

JoySuds shall provide written details and deliver reasonable samples of such non-conforming Products to Reforma in writing (email communication is sufficient)."  *Id.* § 10.2(a).  In either of these instances, "Reforma shall, at its sole cost and expense and without delay, at JoySuds's option, either (i) replace such Non-Conforming Product" or "(ii) promptly refund JoySuds any monies collected with regard to such Non-Conforming Products" with certain incremental costs borne by Reforma.  *Id.* § 10.2(b).  Further "the remedies set forth in this Section 10.2(b) shall be JoySuds's sole remedy for Non-Conforming Product."  *Id.*

Section 13 sets out the various means available to the parties to terminate the Supply Agreement.  The agreement may be terminated by either party

> upon default or breach of obligations or warranties of the other Party, by giving the other Party written notice of its intention to so terminate, which notice shall specify the subject default or breach in reasonable detail and such termination shall become effective thirty (30) days from the receipt of such notice by the notified Party, provided that such default or breach is not cured by the notified Party, to the reasonable satisfaction of the notifying party, within that time, a later time not longer than forty-five (45) days if such breach cannot reasonably be cured within such time to cure, so long as the breaching Party has taken commercially reasonable measures to implement such cure and pursues such measures to a full cure (as determined by the non-breaching party), or a later time agreed upon by the Parties In Writing.

*Id.* § 13.1(a) (emphasis omitted).  Additionally, the agreement could be terminated "by either Party by giving the other Party written notice of its intention to terminate which shall become effective one hundred and twenty (120) days from the receipt of such notice by the notified Party."  *Id.* § 13.1(c).

Section 16 includes a series of miscellaneous provisions.  The Supply Agreement "shall be interpreted in accordance with, and governed by, the laws of the State of New York without regard to its conflict of law principles."  *Id.* § 16.2.  The Supply Agreement further "may not be modified orally, and no modifications or any claimed waiver of any of the provisions of this Agreement

shall be binding unless in writing and signed by the Party against whom such modification or waiver is sought." *Id.* § 16.5.  Finally, the Supply Agreement mandates that "notices, consents and other communications required or permitted by this Agreement shall be in writing" and delivered to specific persons either by hand or "by nationally recognized overnight courier service with signature on delivery requested," "by facsimile with telephonic confirmation," or "by certified mail, return receipt requested." *Id.* § 16.8.

Contemporaneously with the Supply Agreement, the parties also executed a notice that recognized a Surge Temporary Price Adjustment (the "Price Surge Agreement").  Am. Compl. ¶ 40.  That notice provided, *inter alia*, that Reforma had "provided Joysuds with sufficient documentation establishing [an] industry wide systemic material increase," but that "the 'Surge Temporary Price Adjustment' shall not result in a permanent increase in the Base Prices; **the adjustment shall only be temporary**, shall be reevaluated monthly, and shall be readjusted back to the Base Price prior to the Surge Temporary Price Adjustment **once the cost, charge or fee normalizes**." *Id.* ¶ 41 (quoting notice for the Price Surge Agreement).

In June 2021, JoySuds wrote an email to Reforma stating:

> Regarding raw material price increases, we would prefer to work within the framework of our supply agreement with Reforma versus dealing with it on a one-off basis each time.  We need a formal mechanism to address price changes and some amount of forenotice so that we too can manage our own business, customers and P&L.  As per the supply agreement, if you believe there has been an industry-wide systematic increase in a pricing input, then please provide documentation that supports the increase and the proposed new price.  We then have 30 days to review the documentation and proposed increase before the change would then go into effect.

*Id.* ¶ 49.

On July 15, 2021, Reforma again raised prices. *Id.* ¶ 48.  JoySuds "responded, demanding that Reforma follow the procedures outlined in the Agreement." *Id.*  But Reforma "refused to

abide by the Agreement's terms, made numerous misrepresentations, and forced JoySuds to succumb to an extracontractual unauthorized price increase." *Id.* ¶ 50. JoySuds never consented to this price increase, or to any other, but instead "strenuously objected to each price increase." *Id.* ¶ 51. Reforma "refused to provide documents establishing the price increase, refused to provide JoySuds 30 days to review the material as none was provided," and "refused to engage in good faith negotiations with JoySuds regarding the price increase, thereby placing JoySuds under economic duress." *Id.* ¶ 52. Reforma instead "invoiced JoySuds at the new increased prices under threat of otherwise not delivering the Products." *Id.* JoySuds "had no choice but to make substantial payments towards the increased prices" "because it was impossible for JoySuds to immediately find another manufacturer of the Products within its deadlines" and "delay would be devastating to JoySuds' business." *Id.* ¶ 53.

Throughout the life of the Supply Agreement, Reforma "never met JoySuds' forecast requirements." *Id.* ¶ 92. And specifically, on July 31, 2021, Reforma informed JoySuds that it did not have the capacity to manufacture the "most important and profitable" of the products subject to the Supply Agreement. *Id.* ¶ 93. Despite months of searching by Reforma, JoySuds eventually was the one who found a replacement manufacturer, and once that manufacturer was found Reforma "initially refused to provide the material and know how required to make the product." *Id.* ¶ 95.

By September 2021, JoySuds was receiving customer complaints about the consistency of its soap because of Reforma's failure to produce products in compliance with JoySuds's specifications, despite the fact that JoySuds had "provided Reforma all documentation required as related to the [product] Specifications, including the formula cards required." *Id.* ¶¶ 66-68. Reforma "refused to further investigate and provide testing" when JoySuds advised it of the

problems.  *Id.* ¶ 69.  In fact, the "formula [Reforma] was actually using . . . materially differed" from the specifications provided by JoySuds.  *Id.* ¶ 70.  At the same time, "certain retailers complained that the 30-ounce lemon [soap] bottles actually had orange UPC codes," because Reforma had negligently mislabeled the products, which "resulted in JoySuds scrambling to determine how many cases of Products were affected, retrieving those Products from retailers, re-labeling the Products, and otherwise handling damage control."  *Id.* ¶ 90.  This mislabeling meant that "inventory had to be recalled from distributors['] and wholesalers['] shelves" and "consumer complaints had to be responded to."  *Id.* ¶ 91.

In October 2021, JoySuds "asked for the batch records that Reforma was using for each formula so that it could attempt to decipher exactly what was occurring with the Product as the batch records would show information about the specific chemicals used and mixing instructions, among other things."  *Id.* ¶ 71.  In response, Reforma "provided blank sheets of paper and the formula cards, providing no actual real data for a batch that was produced, making it impossible for JoySuds to determine the root of the issue with the Product."  *Id.* ¶ 72.  About a month later, on November 4, 2021, Reforma "acknowledged . . . that JoySuds would be moving all of its professional [stock keeping units ('SKUs')]," which include three of the products under the Supply Agreement, and asked how it could "accommodate the transfer accordingly."  *Id.* ¶ 98.  But despite this offer, Reforma "then claimed it could not assist in the transfer due to 'labor shortage' and 'all the supply chain issues.'"  *Id.*

Customers continued to complain about JoySuds's products including by pointing to the fact that soap lacked suds, became "slushy" at certain temperatures, was "cloudy and not working well," was "hard to pour," was the wrong color, and was incorrectly labeled.  *Id.* ¶ 74.  JoySuds brought these issues to Reforma's attention on December 1, 2021, *id.* ¶ 75, and Reforma responded

on December 6 that it was "working to address [JoySuds's] concern" and had "separated the particular ingredient we believe to be the cause," *id.* ¶ 76.  Reforma assured JoySuds that it was "working with [its] vendor and [was] putting into place a plan to ensure that this will not happen again." *Id.*  That same month, Reforma "delayed shipments to perform refrigeration tests to assess the 'cloudiness' problem, and as a result, production had to be delayed and restarted." *Id.* ¶ 77.

Reforma raised pries yet again, this time by thirty to forty percent, on January 1, 2022 "without following the procedures outlined in the Agreement." *Id.* ¶ 54.  JoySuds again "had no other choice but to acquiesce and make substantial payments under the invoices . . . as it had no other producers to manufacture the products in the forecasts that JoySuds required and Reforma repeatedly and in bad faith threatened to stop manufacturing and shipping JoySuds' products." *Id.*  After learning of additional customer complaints, "Reforma essentially admitted that the products get cloudy at temperatures above freezing simply by virtue of a chemical reaction" but "did not replace the products nor credit any invoices or amounts paid." *Id.* ¶¶ 78-80.  By late January, Reforma acknowledged that JoySuds "had to slow production" of one of the products "for the next few weeks because of the" cloudiness of the product, but Reforma "selfishly urged Joy Suds not to adjust the schedule so as not to interfere with Reforma's logistics vendors." *Id.* ¶ 81.

On February 24, 2022, the CEOs of JoySuds and Reforma met because Reforma was concerned that it was no longer producing one of the products covered by the Supply Agreement. *Id.* ¶ 61.  JoySuds had "ceased Reforma's production" of this product because Reforma "could not meet the quantity or quality requirements" and Reforma was concerned it would "lose other SKUs." *Id.*  Reforma "admitted to JoySuds that something was wrong" with the product, and "they could not produce it at the quantities JoySuds required and according to the specifications." *Id.* ¶ 62.  At this same meeting, Reforma "admitted to JoySuds that Reforma was the cause of the

quality issues" that JoySuds had been experiencing because "Reforma was using an inappropriate form" of an ingredient "that resulted in very high viscosity, causing the soap to flow very slowly from the bottle, [causing] the liquid [to] appear[] cloudy, and causing caking of the top of the bottle." *Id.* ¶ 87 (emphasis omitted). JoySuds alleges that "[u]pon information and belief, Reforma intentionally and knowingly selected an inappropriate form" of the ingredient in order "to save itself manufacturing costs, yet passed these costs on to JoySuds under the Notice of temporary price increase, and, all the while increased the costs of raw materials charged to JoySuds." *Id.* ¶ 88.

After JoySuds provided information to Reforma about lower pricing available from other manufacturers, *id.* ¶ 63, Reforma responded that it was unable to meet those lower prices and then "became increasingly aggressive in its quest for payment and repeatedly and in bad faith threatened not to ship products, even when invoices were not in default," *id.* ¶ 64.

JoySuds alleges that it "generally made timely or early payments throughout the parties' agreements and, if it paid late, it was merely by days, which payments were always accepted by Reforma." *Id*. ¶ 45. Reforma regularly told JoySuds that it would continue to ship product even when JoySuds "may have been in arrears of payments, but at the same time kept the threat over JoySuds that if [price] increases were not agreed to it would stop shipping." *Id.* ¶ 46. Reforma "refused to reevaluate prices monthly and intentionally and negligently failed to provide information to enable JoySuds to determine if the prices normalized, despite JoySuds' repeated requests." *Id.* ¶ 47. On March 20, 2022, Reforma informed JoySuds that it would "keep shipping despite [JoySuds's] arrears." *Id.* ¶ 102.

JoySuds also "repeatedly contacted Reforma to reassess pricing and push for documentation and a decrease in pricing." *Id.* ¶ 56. But Reforma "ignored JoySuds' requests"

and instead "did not provide documentation establishing the need for the increase, provide JoySuds 30 days to review the materials, or have a good faith discussion on the dollar for dollar impact of the increase." *Id.* ¶ 57.

JoySuds alleges that Reforma's "conduct conflicts with industry custom and practice in the manufacturing industry whereby a manufacturer provides advance notice and documentation supporting the anticipated increase in raw materials after attempting to reduce the impact on its client." *Id.* ¶ 59. Nor were these input price increases industry wide, as "months into the [Supply] Agreement, JoySuds was able to find manufacturers with lower prices, although with substantial delays to start with a new manufacturer." *Id.* ¶ 60.

Further, JoySuds alleges that "[t]hroughout the term of the parties' [Supply] Agreement, Reforma shipped thirty-four percent (34%) less than the parties' agreed upon supply requirements (from July 2021 through December 2021) and has *never* shipped on-time." *Id.* ¶ 100.

On April 4, 2022, Reforma sent JoySuds an email which stated it was "a notice of termination in accordance with the Supply Agreement" and which further stated that Reforma would "be holding all shipments until all past due amounts are paid in full or an agreed payment plan is in place." *Id.* ¶ 105. The notice "references . . . various invoices that are allegedly past due" and "nowhere accounts for any credits towards the numerous Non-Conforming Products and/or Latent Defects, even though Reforma was on notice on multiple occasions of the problems with the Products." *Id.* ¶ 106. Reforma then refused to allow Aero Fulfillment Services ("Aero"), which was JoySuds's "logistics provider[,] . . . to access the Products for shipment." *Id.* ¶ 108. Following this termination, Reforma "contacted JoySuds' business partner, including its logistics partner [*i.e.*, Aero][,] and deliberately interfered with relationships with distributors and customers,

in an effort to unlawfully interfere with JoySuds' business relationships and damage its reputation." *Id.* ¶ 109.

As damages, JoySuds alleges that it is entitled to "all amounts paid for JoySuds products since April 2021 through termination at prices that differ from the prices set forth on Exhibit A." *Id.* ¶ 65.  It further alleges that Reforma's failure to follow product "specifications resulted in loss of business, delays of getting products on the shelves and increased costs to JoySuds in an attempt to rectify the issues and not lose the customer and loss of customers," *id.* ¶ 82, as well as "immeasurable" harm to JoySuds's reputation and its "relationship with its customers, retailers and/or distributors," *id.* ¶¶ 82, 85.  Additionally, because of the need to find other manufacturers, JoySuds lost "time of its own personnel" and "was required to source and pay other manufacturers' fees to fulfill the same Services Reforma was contracted to provide causing a delay of the delivery of its products." *Id.* ¶ 101.  In particular JoySuds alleges that "relationships with wholesalers, customers, and distributors, such as Premier Inc. and Yum Brands (Pizza Hut) were lost and sales declined by over $1.1 million dollars across approximately 30,000 cases." *Id.*

## B.    Procedural History

JoySuds initiated this action in the Supreme Court of the State of New York, New York County, on April 7, 2022.  Dkt. 1 at 1.  Reforma removed the litigation to federal court in this District on May 10, 2022.  *Id.*  After Reforma filed an initial motion for judgment on the pleadings, Dkt. 27-29, JoySuds amended its complaint, Dkt. 31. The Court dismissed without prejudice Reforma's original motion for judgment on the pleadings as moot, since that motion concerned the prior Complaint.  Dkt. 33.  In the Amended Complaint, JoySuds brings three claims against Reforma: one for breach of contract, Am. Compl. ¶¶ 110-27, one for "Negligence/Gross Negligence," *id.* ¶¶ 128-43, and one for tortious interference with business relations, *id.* ¶¶ 144-

54.   Reforma moved again for judgment on the pleadings on August 1, 2022.   Dkts. 42, 43

("Motion"), 44.  JoySuds responded on August 23, 2022.  Dkts. 51, 52 ("Opposition").  Reforma

filed a reply on September 2, 2022.  Dkt. 58.

## II.      Standard of Review

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical

to that for granting a Rule 12(b)(6) motion for failure to state a claim."  *Lively v. WAFRA Inv.*

*Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d

67, 75 (2d Cir. 2020)).  To survive a motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim

is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  A

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level."  *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual

allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*,

807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual

allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009)

(citation omitted).

## III.      Discussion

### A.      Breach of Contract Claims

#### 1.      JoySuds's Performance

Reforma first argues that JoySuds has failed to state a claim because JoySuds's own

allegations establish a breach of the Supply Agreement by JoySuds, preventing JoySuds from

pleading its own performance and thereby barring its claims.  Motion at 9.  In particular, Reforma claims that JoySuds's allegations show that JoySuds failed to pay invoices within thirty days as required by section 5.1 of the Supply Agreement.  *Id.*

"Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Invs. Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir. 1998) (internal quotation marks omitted).  "The measure of whether a party has adequately performed under a contract is substantial performance." *Express Freight Sys. Inc. v. YMB Enters. Inc.*, No. 20 Civ. 186 (ARR) (LB), 2022 WL 3682294, at *9 (E.D.N.Y. Aug. 25, 2022); *see also Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17 Civ. 1898 (AJN), 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021) ("In order to recover for breach of contract, a party must first show it substantially performed under that contract.").  Further, "[t]he question of substantial performance is usually one of fact and should be decided as a matter of law only where the inferences are certain." *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 312 (2d Cir. 2016) (internal quotation marks omitted).  Reforma's accusations that JoySuds's pleadings show that JoySuds itself breached the Supply Agreement are relevant to this analysis because "[m]aterial breach and substantial performance are two sides of the same coin." *Pub. Art Fund v. Titon Builders, Inc.*, No. 13 Civ. 7620 (PAC), 2016 WL 3685086, at *5 (S.D.N.Y. July 5, 2016); *see also Bernard v. Las Ams. Commc'ns, Inc.*, 84 F.3d 103, 109 (2d Cir. 1996) ("A finding that Bernard's conduct in representing LAC materially breached his contract with LAC, however, is equivalent to a finding that Bernard did not substantially perform under the contract." (citing John D. Calamari & Joseph M. Perillo, *Contracts* § 11-18, at 461-62 (3d ed. 1987) ("Substantial performance is the antithesis of material breach.  If it is determined that a breach is material, it follows that substantial

performance has not been rendered." (brackets omitted)))); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552 (S.D.N.Y. 2014) ("[A] party can enforce a contract as long as he has not committed a material breach."). Further, "[u]nder New York Law, for a breach of contract to be material, it must go to the root of the agreement between the parties" such that it "defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (internal quotation marks omitted).

The Court determines that JoySuds's allegations of its performance are sufficient. JoySuds alleges that it "adequately performed its obligations under the [Supply] Agreement," Am. Compl. ¶ 112, along with allegations that establish "sufficient factual matter from which the Court can infer that [the relevant party] performed under the relevant agreement," *Boustead Sec., LLC v. Leaping Grp. Co.*, No. 20 Civ. 3749 (VEC), 2021 WL 3774116, at *3 (S.D.N.Y. Aug. 25, 2021); *see e.g.* Am Compl. ¶¶ 31, 32, 44, 45, 66. It is true that JoySuds's allegations appear to acknowledge that at least some invoices were at times in arrears. *See* Am. Compl. ¶¶ 46 ("Reforma misrepresented to JoySuds throughout the relationship that it would continue shipping even where JoySuds may have been in arrears of payments . . . . On March 20, 2022, for example, [Reforma's CEO stated that it] would keep shipping to JoySuds despite its arrears."), 80 ("[M]any of the 'past' due invoices are invalid."), 107 ("Reforma [did not] allow JoySuds the opportunity to cure, to the extent any invoices were valid and past due."). But at this stage of the case, such acknowledgements are not sufficient to defeat the allegations of performance for two reasons.

First, drawing all inferences in favor of JoySuds, JoySuds's allegations that it "generally made timely or early payment throughout the parties' agreements," *id.* ¶ 45, and Reforma's continued shipment of product despite any late payment, *id.* ¶¶ 45, 46, are sufficient to allege JoySuds's performance. The extent to which any payments were late goes to the question of

whether performance was substantial—or in other words, whether late payment of invoices constituted a breach sufficiently material to bar JoySuds's claims.  These are questions "of fact and should be decided as a matter of law only where the inferences are certain."  *Bank of N.Y. Mellon Tr. Co.*, 821 F.3d at 312 (internal quotation marks omitted); *see Khmaladze v. Vorotyntsev*, No. 16 Civ. 8029 (GHW), 2019 WL 1746006, at *5 (S.D.N.Y. Apr. 18, 2019) (holding an allegation of performance adequate where the party "allege[d] that it performed its obligations" and "explain[ed] how it did so").

Second, and perhaps more importantly, there is an additional question of fact as to whether Reforma waived its rights to timely payment of the invoices, which cannot be resolved at this stage.  "A breach of contract may be waived by the non-breaching party."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 584-85 (2d Cir. 2006) (citing *N.Y. Tel. Co. v. Jamestown Tel. Corp.*, 26 N.E.2d 295, 297 (N.Y. 1940)).  Waiver "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage."  *Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) (internal quotation marks omitted).  "The intent to waive is usually a question of fact."  *Beth Israel Med. Ctr.*, 448 F.3d at 585 (alterations and internal quotation marks omitted). And while the Supply Agreement contains a no-waiver clause, Supply Agreement § 16.5, under New York law "the mere existence of [a no-waiver clause] does not preclude waiver of a contract clause," *Morrison v. Buffalo Bd. of Educ.*, 741 F. App'x 827, 830 (2d Cir. 2018) (internal quotation marks omitted) (vacating dismissal of a breach of contract claim where the plaintiff pled allegations from which it could be plausibly inferred that the defendants waived a contractual provision despite existence of no-waiver clause).  JoySuds's allegations that Reforma continued to ship products even when JoySuds was late in making payment, Am. Compl. ¶¶ 46, 102,

sufficiently allege waiver via a course of conduct at this stage of the case.  *See Tekvet Techs., Co. v. Crystaltech Web Hosting, Inc.,* No. 15 Civ. 7284 (LGS), 2016 WL 1651848, at *4 (S.D.N.Y. Apr. 25, 2016) ("Accepting these facts as true, any late payments may not have constituted a material breach of the May 2014 agreement or, in the alternative, were waived by Defendant's continued acceptance of these payments without protest.").

### 2.      Reforma's Non-Conformity Breach

Next, Reforma argues that JoySuds's claim that it violated section 9.1 of the Supply Agreement, which concerns the production of products that did not conform to the required specifications, fails because of a "sole remedy" provision in section 10.1.  Motion at 14.  In relevant part, section 9.1 required that "the Products shall strictly conform to all Specifications."  Supply Agreement § 9.1(b).  JoySuds alleges that Reforma regularly breached this provision by providing non-compliant products suffering from various defects.  Am. Compl. ¶¶ 66-91.

Sections 10.1 and 10.2 of the Supply Agreement govern the treatment of non-conforming products.  Under section 10.1, "JoySuds shall inspect the Products within thirty (30) days after pickup from Reforma" and "[i]f JoySuds discovers any Non-Conformity (defined below) with the relevant purchase order, . . . JoySuds shall notify Reforma within such 30-day period, or such Product shall be deemed to be conforming, except for Latent Defects (defined below)."  Supply Agreement § 10.1.  A "'Non-Conformity' with respect to a shipment shall mean that such shipment includes less than 90% or more than 110% of the scheduled quantity, or that more than 1% of such shipment does not comply with Reforma's warranty set forth in Section 9.1."  *Id.*  Moreover, a 'Latent Defect' with respect to a shipment shall mean a Non-Conformity that could not commercially reasonably be discovered by a visual inspection on or before the date specified in this Section or any Non-Conformity that would manifest itself only after the passage of time or

any Non-Conformity that would manifest itself only after the Products were used by the consumer and had been in commerce for a sufficient period of time that such Non-Conformity would become known to JoySuds, in each case that JoySuds did not find at the time of the initial inspection." *Id.*

If JoySuds "conducts such inspections and discovers any Non-Conformity and JoySuds notifies Reforma as set forth in Section 10.1" or "discovers any Latent Defect, and JoySuds notifies Reforma promptly on discovery, then upon Reforma's request, JoySuds shall provide written details and deliver reasonable samples of such non-conforming Products to Reforma in writing." *Id.* § 10.2(a). In either of these instances "Reforma shall, at its sole cost and expense and without delay, at JoySuds's option, either (i) replace such Non-Conforming Product . . . or (ii) promptly refund JoySuds any monies collected with regard to such Non-Conforming Products" with certain incremental costs borne by Reforma. *Id.* § 10.2(b). Further "the remedies set forth in this Section 10.2(b) shall be JoySuds's *sole remedy* for Non-Conforming Product." *Id.* (emphasis added).

"[S]ole remedy clauses excluding consequential damages are enforceable unless they are unconscionable." *Barrie House Coffee Co. v. Teampac, LLC*, No. 13 Civ. 8230 (VB), 2016 WL 3645199, at *12 (S.D.N.Y. June 30, 2016) (citing N.Y. U.C.C. § 2-719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.")). "Under New York law, a contract may restrict a buyer's remedy to 'return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts.'" *Id.* (quoting N.Y. U.C.C. § 2-719(1)(a)). However, such a limitation is not enforceable if "circumstances cause an exclusive or limited remedy to fail of its essential purpose." N.Y. U.C.C. § 2-719(2). A limited remedy fails of its essential purpose "if the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all." *Maltz v. Union Carbide Chems. & Plastics Co.*, 992 F.

Supp. 286, 304 (S.D.N.Y. 1998) (internal quotation marks omitted).  So, for example, in the case of *President Container Group II, LLC v. Systec Corp.*, a provision limiting the plaintiff to the remedy of "repair or replacement" of defective goods failed of its essential purpose when the defendant was not actually able to repair or replace those goods, because the circumstances at the time of the agreement included an understanding that the defendant would be able to repair or replace them.  467 F. Supp. 3d 158, 169 (S.D.N.Y. 2020).  But, in the same case, a limitation of the plaintiff's remedy to a refund for defective goods did not fail of its essential purpose merely because the defendant did not refund the purchase price when requested because the defendant claimed it had not breached the contract, as opposed to refusing to make a refund for defective goods.  *Id.*

Generally, the question of whether a limited remedy fails of its essential purpose "is a question of fact for the jury and one necessarily to be resolved upon proof of the circumstances occurring after the contract is formed."  *Cayuga Harvester, Inc. v. Allis-Chalmers Corp.*, 465 N.Y.S.2d 606, 611 (App. Div. 1983).  But "a court may grant a defendant's motion to dismiss when the plaintiff cannot show that 'enforcement of the limited remedy clause would effectively deprive [it] of a remedy.'"  *President Container Grp. II*, 467 F. Supp. 3d at 169 (quoting *Maltz*, 992 F. Supp. at 304).  Here, however, there are sufficient factual allegations as to a failure of the limited remedy's essential purpose to survive a motion to dismiss.  JoySuds alleges that it repeatedly and with respect to multiple shipments advised Reforma of defects in the products, that Reforma "refused to further investigate and provide testing" even though it knew it "was using sub-par ingredients," Am. Compl. ¶ 69, and that in at least one instance "Reforma did not replace the products nor credit any invoices or amounts paid," *id.* ¶ 80; *see generally id.* ¶¶ 66-91.  Those allegations are enough at this stage of the case.  *See Waverly Props., LLC v. KMG Waverly, LLC*,

824 F. Supp. 2d 547, 558 (S.D.N.Y. 2011) ("A seller's inability to effect a successful repair or replacement after numerous attempts may demonstrate such a failure of the restricted remedy's essential purpose."); *Barrie House Coffee*, 2016 WL 3645199, at * 13 (finding an issue of fact as to whether sole remedy clause failed of its essential purpose where the defendant failed to repair a product and refused to provide a refund).

\* \* \*

Because the Court rejects each of Reforma's arguments, it denies the motion for judgment on the pleadings with respect to JoySuds's claims for breach of contract.

## B.     Tort Claims

Next, JoySuds brings claims for "Negligence/Gross Negligence," Am. Compl. ¶¶ 128-43, and tortious interference with business relationships, *id.* ¶¶ 144-54.  Reforma argues that each of these claims is duplicative of JoySuds's breach of contract claim, Motion at 16-18, that each claim is barred by the economic loss doctrine, *id.* at 18-19, and that JoySuds has failed to adequately allege each claim, *id.* at 19-25.

### 1.     Tortious Interference

The Court begins with whether JoySuds has failed to state a claim of tortious interference, as this analysis obviates the need to consider whether JoySuds's tortious interference claim is duplicative of its breach of contract claims or is barred by the economic loss doctrine.  JoySuds's tortious interference claim alleges that JoySuds and Reforma had a "special relationship" and that Reforma was "well aware of JoySuds's relationship with Aero,[3] and JoySuds's relationship with its distributors, retailers, and customers" but that Reforma "intentionally and maliciously"

---

[3] Aero Fulfillment Services is referred to as JoySuds's "logistics provider," Am. Compl. ¶ 108, and its "facilities coordinator," *id.* ¶ 145.

interfered with those relationships "by its Termination Notice and refusal to produce the Products," "as it knew that leaving JoySuds out of stock on Product would destroy those relationships." *Id.* ¶¶ 145-48, 151.

"To state a claim for tortious interference with business relations, a plaintiff must adequately allege that: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 105 (2d Cir. 2012) (internal quotation marks omitted). Additionally, "conduct constituting tortious interference with business relations is, by definition, conduct directed *not at the plaintiff itself*, but at the party with which the plaintiff has or seeks to have a relationship." *Id.* at 107 (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004)); *see Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997) ("[U]nder New York law, in order for a party to make out a claim for tortious interference with prospective economic advantage, the defendant must . . . direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.").

Here, JoySuds has failed to state a claim for tortious interference because it has failed to allege that Reforma took any action directed at any third-party with which JoySuds had a relationship, with one exception. *See Carvel*, 818 N.E.2d at 1104-05 (explaining that "[w]hile economic pressure brought to bear by one contracting party on the other may, on rare occasions, be tortious, it cannot constitute the tort of interference with economic relations" because "the economic pressure that must be shown" is pressure on the third parties (internal citations omitted)). The Amended Complaint is almost entirely devoid of allegations that Reforma took any action

towards a specified[4] third party, as opposed to towards JoySuds itself.  The lone exception is JoySuds's allegation that Reforma prevented Aero from accessing products for delivery and that Reforma "contacted" Aero at some point after the termination.  Am. Compl. ¶¶ 109, 152-53. Reforma responds that such an act cannot suffice because Aero was JoySuds's agent and so Reforma's action was taken towards JoySuds, but the authority cited by Reforma does not support or mention such a proposition.  Motion at 24.

JoySuds has alleged that Reforma interfered with its relationship with Aero by withholding shipment and contacting Aero "in an effort to unlawfully interfere with JoySuds' business relationships, and that this action damaged its business relationship."  Am. Compl. ¶¶ 109, 152-53.  That leaves only the question of whether JoySuds has alleged that Reforma "acted for a wrongful purpose or used dishonest, unfair, or improper means."  *Valley Lane Indus.*, 455 F. App'x at 105.  "An essential element of a claim for tortious interference with economic relations in New York is that the defendant acted *solely* out of malice and not simply in pursuit of normal economic self interest."  *Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*, No. 04 Civ. 8042 (LBS), 2007 WL 2254721, at *10 (S.D.N.Y. Aug. 6, 2007) (emphasis added) (citing *Carvel*, 818 N.E.2d at 1103); *see Carvel*, 818 N.E.2d at 1103 (explaining that the "general rule" that tortious interference must make use of unlawful conduct admits of an exception "where a defendant engages in conduct 'for the *sole* purpose of inflicting intentional harm on plaintiffs'" (emphasis added) (quoting *NBT Bancorp, Inc. v. Fleet/Northstar Fin. Grp., Inc.*, 628 N.Y.S.2d 408, 410 (App. Div. 1995))).  If malice is not shown, then a plaintiff must show that the defendant's conduct constitutes "a crime or an independent tort" or otherwise that the defendant employed "wrongful means" including

---

[4] "[P]laintiff must allege a specific business relationship with an *identified* third party with which the defendants interfered."  *Mehrhof v. Monroe-Woodbury Cent. Sch. Dist.*, 91 N.Y.S.3d 503, 505 (App. Div. 2019) (emphasis added).

"physical violence, fraud or misrepresentation, civil suits and criminal prosecutions" or "extreme and unfair economic pressure." *Freidman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009) (internal quotation marks omitted).

JoySuds alleges that Reforma "acted maliciously with the sole purpose of harming JoySuds and in a bad faith attempt to interfere with JoySuds' relationship with Aero." Am. Compl. ¶ 151. But that allegation is conclusory and is rendered implausible by the allegations in the Amended Complaint revealing that Reforma's withholding of product from Aero was also in Reforma's own economic self-interest, as the Amended Complaint alleges that Reforma's termination notice indicates a number of past due payments, rendering it uncertain whether Reforma would be paid for any delivered product. *Id.* ¶ 105. The factual allegations in the Amended Complaint therefore simply cannot support the claim that Reforma acted *solely* to harm JoySuds. *See Carvel*, 818 N.E.2d at 1103 (holding that the alleged tortfeasor "was not acting solely to hurt" the alleged victim because it was acting in its "normal economic self-interest" and had indicated that it "was completely indifferent" to the plaintiff's fate); *Premier Medical Sys., LLC v. NeuroLogica Corp.*, No. 21 Civ. 1337 (GHW), 2022 WL 603999, at *12 (S.D.N.Y. Feb. 28, 2022) (dismissing tortious interference with prospective business relations claim where the defendant acted in its economic interest because the plaintiff could not show that the defendant acted "for the sole purpose of inflicting intentional harm"). Nor do those allegations indicate that Reforma's act constituted a crime or independent tort, or that Reforma employed wrongful means. And as for JoySuds's claim that Reforma "contacted" Aero, Am. Compl. ¶ 109, JoySuds fails to allege what this contact consisted of or how it impacted JoySuds's relationship with Aero.

Therefore, the Court grants the motion to dismiss with respect to JoySuds's tortious interference claims.

2.      **Whether the Negligence and Gross Negligence Claims Are Duplicative of the Contract Claims**

The Court next turns to whether JoySuds's negligence and gross negligence claims are duplicative of its breach of contract claims.  JoySuds's negligence and gross negligence claims contend that Reforma owed a duty to JoySuds based on its "special relationship" which was in turn "based on [Reforma's] specialized knowledge and expertise in the household goods industry." Am. Compl. ¶ 130.  Reforma then allegedly breached that duty by "mislabeling the Products, using an inappropriate SLS, deviating from the Specifications for the Products, and knowingly misrepresenting its capacity and ability to decrease prices after its initial increase."  *Id.* ¶ 133.

The parties agree that a tort claim may co-exist with contractual claims only where (i) "it stems from a duty separate from a defendant's contractual duty to perform," (ii) "it is collateral and extraneous to the contract provision breached," or (iii) "it would yield special damages not recoverable under contract."  *B&M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 487 (S.D.N.Y. 2010) (internal quotation marks omitted); *see* Motion at 16, Opposition at 12-13.  JoySuds presents three possible independent duties that Reforma owed it.  First, it argues that an independent duty may lie if "the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." Opposition at 13 (quoting *Optionality Consulting Pte. Ltd. v. Nekos*, No. 18 Civ. 5393 (ALC), 2019 WL 4523469, at *10 (S.D.N.Y. Sept. 18, 2019)).  Second, it argues that Reforma has admitted in its counterclaims that it took on an independent duty to JoySuds when it stated that it "went above and beyond its contractual duties to aid JoySuds."  *Id.* at 14.  Third, JoySuds alleges that it has pleaded "a duty arising from common law and industry standards."  *Id.* at 16.  And additionally, JoySuds alleges that it has pleaded special damages.  *Id.*

Starting with JoySuds's negligence claims, these definitionally cannot be based on an

independent duty not to willfully harm. *See Sullivan v. City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("[H]arm predicated on an intentional act may not give rise to a claim of negligence." (internal quotation marks omitted)). Indeed, JoySuds cedes that its claim for negligent misrepresentation is *not* a claim for intentional fraud. Opposition at 20 ("Here, JoySuds has *not* pled a claim for intentional fraud but has clearly and sufficiently pled negligence . . . ."). Nor do these claims arise from some duty independent of the contract. JoySuds's argument that Reforma "went above and beyond its contractual duties to aid JoySuds," *id.* at 14, says nothing about whether Reforma had to a duty do so.[5] And indeed, contentions that Reforma negligently mislabeled products, deviated from product specifications, and misrepresented its "capacity and ability to decrease prices after its initial increase," Am. Compl.

---

[5] JoySuds's allegations that Reforma "held itself out as having specialized expertise and knowledge in the household goods industry," that JoySuds "had a special relationship with Reforma as it reposed trust and confidence in Reforma based on its specialized knowledge and expertise in household goods industry," that "Reforma, as a manufacturer and distributor in the household industry, having held itself out as having specialized expertise and knowledge, owed a duty of care to JoySuds," and that "Reforma, as a manufacturer and distributor in the household industry had unique, superior, and specialized knowledge and expertise in the manufacturing of the Products and prices of goods and raw materials in the industry," Am. Compl. ¶¶ 129-32, are both unsupported by any underlying factual allegations and at odds with the relationship created by the Supply Agreement. Reforma was bound to manufacture and label products "in strict compliance" with specifications created by JoySuds. Supply Agreement § 2. Similarly, JoySuds "shall provide Reforma with all necessary processes, trade secrets, manufacturing know-how, and rights for Reforma to manufacture the Products." *Id.* These provisions at the least indicate that JoySuds and Reforma were on equal footing in this industry, and if anything lean more towards *JoySuds* being the party with specialized knowledge. The fact that JoySuds could "manufacture [products] for its own benefit" if Reforma failed supply JoySuds adequately for more than fifteen days, *id.* § 8.2, further strengthens this point.

And while JoySuds points to a series of judicial decisions to support its argument that Reforma had "specialized knowledge" in the "household industry," which created a duty of care, Opposition at 15, none of these cases support the proposition that a consumer goods manufacturer may be liable in tort to its buyer merely because the buyer is inexperienced. Indeed, if the Court were to endorse such a rule, it is difficult to see any situations in which a manufacturer would not have independent tort duties to its clients, which would be at odds with the general rule that contractual and tort claims only co-exist in narrow and specific circumstances.

27

¶ 133, all stem from Reforma's obligations under the Supply Agreement to manufacture and label products in compliance with specifications, Supply Agreement § 2(c), its representation that it had the capacity to produce sufficient product amounts, *id.* § 4.2, and its contractual duty to "reevaulate[] monthly" and "readjust[] back to the Base Price" and any price increases, *id.* § 5.2.2. These arguments thus make up part of JoySuds's claim that Reforma breached those contractual provisions.[6] *See Soroof Trading Dev. Co. v. GE Microgen Inc.*, No. 10 Civ. 1391 (LGS), 2013 WL 5827698, at *9 (S.D.N.Y. Oct. 30, 2013) ("Under New York law, where a claim for misrepresentation 'arises out of the same facts as plaintiff's breach of contract claim,' the misrepresentation claim 'is redundant and plaintiff's sole remedy is for breach of contract.' A separate claim for misrepresentation cannot survive where it 'arises out of the identical facts and circumstances and even contains the same allegations, as the cause of action alleging breach of contract.'" (twice quoting *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001), then quoting *34-35th Corp. v. 1-10 Indus. Assocs., LLC,* 768 N.Y.S.2d 644, 644 (App. Div. 2003))).

As for "special damages," New York law requires that they be pled with particularity in the tort context.[7] *See Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641 (2d Cir. 2015) (product disparagement); *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 400-01

---

[6] Nor can industry custom and practice give rise to an extra-contractual duty, as "custom and practice do not give rise to an independent legal duty." *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, Nos. 01 Civ. 2946 (DLC), 01 Civ. 7670 (DLC), 2004 WL 359138, at *4 (S.D.N.Y. Feb. 26, 2004).

[7] JoySuds does not contest this fact but argues that it "has also pled special damages with particularity by detailing its lost profits and lost customers." Opposition at 16. The Court notes that JoySuds has additionally alleged similar damages for "loss of business," "loss of customers," "harm to JoySuds' reputation," and harm to "its relationship with its customers, retailers and/or distributors" in relation to its breach of contract claim for non-conforming products, Am. Compl. ¶¶ 82, 85, and that the Court has already determined that the question of whether the sole remedy clause bars these damages is not one for a motion to dismiss, *see supra* III.A.2.

(S.D.N.Y. 2007) (prima facie tort).  With respect to lost sales, that rule requires a plaintiff to "both name the individuals who ceased to be customers, or who refused to purchase, and itemize the exact damages."  *Bilinski*, 632 F. App'x at 641 (internal quotation marks omitted).  JoySuds has not quite met that standard here.  It alleges that "relationships with wholesalers, customers, and distributors, such as Premier Inc. and Yum Brands (Pizza Hut) were lost and sales declined by over $1.1 million dollars across approximately 30,000 cases."  Am. Compl. ¶ 101.  This allegation both fails to identify the exact damages ("*over* $1.1 million dollars") and fails to identify each of the lost customers, instead identifying only examples.

Therefore, as JoySuds has not adequately alleged that its negligence claims stem from any duty independent of the contract or give rise to special damages, the Court grants the motion to dismiss those claims.

Each of these arguments, with the exception of the analysis for willful conduct, applies with equal force to JoySuds's claim for gross negligence.  With respect to that claim, JoySuds argues that it "has adequately pled that Reforma recklessly and repeatedly made misrepresentations and omissions and provided false assurance to JoySuds."  Opposition at 21.  But "[c]laims for gross negligence and willful misconduct sound in contract rather than tort where, absent a contractual agreement, the defendant would have had no duty to plaintiffs."  *Filmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 19 (2d Cir. 2014) (brackets and internal quotation marks omitted).  Here, Reforma's obligations to speak at all about pricing, capacity, and product compliance with specifications arose not from an independent duty, but from the Supply Agreement as discussed *supra*.

JoySuds's cited authority is not to the contrary.  *See* Opposition at 21-22.  In *Tekvet Technologies*, the court held that a gross negligence claim was not barred by the economic loss

rule because of an express exception to the doctrine created for bailees.  2016 WL 1651848, at *5.

And in *Taylor Precision Products Inc. v. Larimer Group, Inc.*, while the court determined that a

gross negligence claim related to representations was not duplicative of a breach of contract claim,

that was because the "representations were more than mere promises to perform, but were

misrepresentations of present fact, necessarily collateral to the contract," which were made prior

to contracting.  No. 15 Civ. 4428 (ALC), 2018 WL 4278286, at *7-8, 19 (S.D.N.Y. Mar. 26, 2018).

None of the misrepresentations alleged, and particularly those cited to by JoySuds, are

similar.  Opposition at 21.  In paragraph 46 of the Amended Complaint, JoySuds alleges that

"Reforma misrepresented to JoySuds throughout the relationship that it would continue shipping

even where JoySuds may have been in arrears of payments."  This is not a misrepresentation of

present fact and is moreover fundamentally tied to Reforma's obligations to provide product under

the Supply Agreement.  Or, in paragraph 95 of the Amended Complaint, JoySuds alleges that

Reforma's CEO "repeatedly advised JoySuds that she was working on it" with "it" meaning

finding alternative suppliers.  This is simply a promise to perform under the Supply Agreement.

As for allegations that Reforma "knowingly misrepresent[ed] its capacity and ability to decrease

prices after its initial increase," Am. Compl. ¶ 133, these claims are intrinsically tied to Reforma's

representation that it had the capacity to produce sufficient product amounts, Supply Agreement

§ 4.2, and its contractual duty to "reevaulate[] monthly" and "readjust[] back to the Base Price"

following any price increases, *id.* § 5.2.2.  Finally, JoySuds in passing states that Reforma made

misrepresentations related to "the materials substitutions it was making," Opposition at 16, but a

review of JoySuds's Amended Complaint reveals no allegation of such a misstatement, besides a

conclusory allegation to that effect in paragraph 135, which need not be credited by the Court

absent further factual support, *see LaFaro*, 570 F.3d at 475-76.  At most, JoySuds can point to its

allegation that Reforma knew that "it was Reforma's fault as it was using sub-par ingredients," Am. Compl. ¶ 69, and yet stated it was conducting a search for the problem ingredient, *id.* ¶¶ 70-88, but such a claim would be one for intentional misrepresentation, which JoySuds has explicitly disclaimed, Opposition at 20 ("JoySuds has *not* pled a claim for intentional fraud but has clearly and sufficiently pled negligence."). Each of JoySuds's misrepresentation allegations therefore arise from its contractual relationship with Reforma, and must be dismissed as duplicative. Therefore, the Court grants the motion to dismiss the gross negligence claims.

## C.     Leave to Amend

Lastly, the Court considers whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). JoySuds has not sought leave to amend. "But even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*." *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (citation and internal quotation marks omitted) (collecting cases). When deciding whether to *sua sponte* grant leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility." *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020). After considering these factors, the Court will grant JoySuds leave to file a Second Amended Complaint in the event that it believes it can remedy the pleading defects identified by the Court. JoySuds previously amended its complaint after Reforma filed a motion for judgment on the pleadings, Dkts. 27, 28, 31, but there is no indication that JoySuds made that amendment in bad faith or to cause delay. Nor has JoySuds repeatedly failed to cure deficiencies. Finally, the Court determines that amendment would not present undue prejudice to Reforma,

especially given that the Court has granted Reforma similar leave to amend its counterclaims.  The Court therefore grants JoySuds leave to amend its Amended Complaint.  The Court emphasizes that JoySuds should only file a Second Amended Complaint if it is able to remedy the pleading deficiencies addressed herein.

### IV.    Conclusion

For the reasons stated above, Reforma's motion for judgment on the pleadings is granted in part and denied in part.  Reforma's motion is denied as to JoySuds's claim for breach of contract.  JoySuds's claims for negligence, gross negligence, and tortious interference are dismissed.  The Court grants JoySuds leave to amend its Amended Complaint.  In the event JoySuds decides to file a Second Amended Complaint, it must file it within thirty days of this Opinion and Order.  The Clerk of Court is respectfully directed to close the motion pending at Docket Number 42.

SO ORDERED.

Dated: March 31, 2023
       New York, New York

_____
JOHN P. CRONAN
United States District Judge