UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                :

JOYSUDS, LLC,                                  :

                                      :

                Plaintiff,                :

                                        :          22 Civ. 3781 (JPC) (OTW)

        -v-                        :

                                        :          <u>OPINION AND ORDER</u>

N.V. LABS, INC. d/b/a REFORMA GROUP,    :

                                        :

                Defendant.          :

                                        :

---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Defendant N.V. Labs, Inc., doing business as Reforma Group ("Reforma"), brings counterclaims against Plaintiff JoySuds, LLC ("JoySuds"), for three counts of breach of contract and one of breach of the implied covenant of good faith and fair dealing. JoySuds moves to dismiss each counterclaim for failure to state a claim. Because Reforma has adequately alleged each of its three breach of contract claims, JoySuds's motion is denied with respect to those claims. But because Reforma's claim for breach of the implied covenant of good faith and fair dealing is duplicative of its breach of contract claims, the Court grants JoySuds's motion to dismiss Reform's implied covenant claim. Reforma is granted leave to amend its counterclaims in the event it can plead a viable, non-duplicative cause of action for breach of the implied covenant.

## I. Background[1]

### A. Factual Background

JoySuds acquired the branding rights to "Joy" dish detergent products in 2019. Counterclaims ¶ 18. Reforma is a manufacturing company. *See id.* ¶¶ 14, 17; *accord* Am. Compl. at 1. On April 6, 2021, JoySuds and Reforma entered into the Supply Agreement, under which Reforma would manufacture certain Joy products and sell them to JoySuds. Counterclaims ¶ 19. The Supply Agreement is sixteen pages long, including signature pages and exhibits, and contains many provisions not immediately relevant to JoySuds's motion. *See generally* Supply Agreement. Below is a description of those provisions that are.

The Supply Agreement commenced on April 6, 2021 and was to continue for a two-year period, with automatic one-year renewals unless a party terminated the agreement. *Id.* § 1. Reforma was to provide certain "services with respect to the Products during the Term of this Agreement on a non-exclusive basis." *Id.* § 2. Those services include "purchase and procure raw materials to manufacture the Products," "store raw materials for the Products," "manufacture and label the Products in strict compliance" with provided specifications, "package, warehouse and store Products for pick-up by JoySuds' logistic partner," and "sell the Products to JoySuds under

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Counterclaims, Dkt. 38 at 15-34 ("Counterclaims"), as well as documents incorporated by reference in or integral to the Counterclaims, most notably the parties' Supply Agreement, Dkt. 40-2 ("Supply Agreement"). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010); *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 90 (S.D.N.Y. 2020); *see also Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"). The Court also relies on those facts alleged in the Amended Complaint, Dkt. 31 ("Am. Compl."), which Reforma has admitted in its Amended Answer, Dkt. 38 at 1-15 ("Am. Answer"). Where factual allegations are contained both in the Amended Complaint and the Counterclaims, the Court cites only to the Counterclaims.

2

the terms set forth herein." *Id.* JoySuds was to "provide Reforma with all necessary processes, trade secrets, manufacturing know-how, and rights for Reforma to manufacture the Products." *Id.* The Supply Agreement sets out the "Products" for Reforma to produce at Exhibit A. *Id.* § 3; *see also id.*, Exh. A. These Products were "to be manufactured and sold by Reforma on a non-exclusive basis and purchased by JoySuds." *Id.* § 3. Pricing would be "as mutually agreed by the Parties In Writing" and the Products would be produced "in accordance with the specification of those Products." *Id.* The Supply Agreement defines "In Writing" as "a formal amendment agreed to in writing and signed by the Parties" or "an unambiguous exchange of contemporaneous emails by individuals with authority to act on behalf of the respective Parties that explicitly state one Party's desired amendment, and the other Party's explicit agreement to the proposed amendment." *Id.*

JoySuds agreed to "provide Reforma a written rolling three-month production schedule at least fourteen (14) days prior to the beginning of each calendar month" for purchase orders. *Id.* § 4.1. The parties would then "mutually agree In Writing upon scheduled production during a particular week for the monthly volume" and Reforma would "comply with such Weekly Scheduled Production." *Id.* If Reforma could not "strictly comply with the Weekly Scheduled Production, Reforma shall immediately notify JoySuds, and Reforma and JoySuds shall use reasonable and diligent efforts to resolve the scheduling production issue." *Id.* "[U]pon delivery of each Production Plan to Reforma," JoySuds was to "purchase the Products scheduled to be manufactured and shipped during the first month of the Production Plan." *Id.* If Reforma was "unable to meet the production schedule for the first month in a Production Plan," then it was to "notify JoySuds in writing (email communication is sufficient) prior to the start of such month, and the Parties shall reasonably re-adjust the Production Plan In Writing." *Id.* In the Supply

3

Agreement, Reforma agreed that it had "been provided with proposed forecasts for the Products

from JoySuds" and "represent[ed] and warrant[ed] that it has the capacity and ability to produce

the Products in accordance with the Proposed Forecasts within the time and quantities set forth

therein." *Id.* § 4.2.

Pricing terms are set forth in section 5 of the Supply Agreement, titled "Price and Payment

Terms." *Id.* § 5.[2]  JoySuds would "pay Reforma for the finished Products at the price set forth on

Exhibit A (the 'Base Price')." *Id.* § 5.1.  Reforma would "issue invoices to JoySuds for the Base

Price which shall be paid by JoySuds net 30 days from the date the underlying JoySuds Purchase

Order is picked up at Reforma." *Id.*  But

> [i]f Reforma incurs any industry-wide systemic material increase or decrease in a
> specific cost, charge or fee beyond its control of the Base Price, Reforma shall
> provide JoySuds (i) immediate notice of such material increase or decrease, and (ii)
> sufficient documentation establishing such industry-wide systemic material
> increase or decrease in costs, charge or fee beyond Reforma's control . . . .  JoySuds
> shall have thirty (30) days from receipt of the documentation establishing the
> increase or decrease to review the documentation and take sufficient steps to verify
> the same.  Thereafter, if there is a material increase or decrease, the parties shall
> cooperate in good faith to determine the resulting dollar-for-dollar impact of such
> increase or decrease on the Base Price, if any ("Surge Temporary Price
> Adjustment").

*Id.* § 5.2.2.  Such a price increase would "not result in a permanent increase or decrease in the Base

Price; the adjustment shall only be temporary, shall be reevaluated monthly, and shall be readjusted

back to the Base Price prior to the Surge Temporary Price Adjustment once the cost, charge or fee

normalizes." *Id.*

---

[2] The Court quotes words and phrases written in all capital letters in the Counterclaims and
Supply Agreement in accordance with the normal capitalization rules used for titles.

JoySuds in turn could revise the specifications for the products manufactured by Reforma "only with the mutual consent of both Parties (not to be unreasonably withheld by Reforma) In Writing, and so long as JoySuds bears any and all costs associated with such changes." *Id.* § 5.3.

Another provision of the Supply Agreement sets forth the terms under which JoySuds would pick product up from Reforma's warehouse. *Id.* § 6.0. Reforma would "notify JoySuds of the scheduled date for production of an order as soon as such date is scheduled ('Schedule[d] Production Date') and shall use best efforts to provide such notice at least 5 days prior to the Scheduled Production Date." *Id.* "Warehouse pick-up of the Products at Reforma may be scheduled up to two business days prior to or two business days after the Scheduled Production Date." *Id.*

The Supply Agreement also addresses JoySuds's ability to purchase products from a supplier other than Reforma in the event Reforma was unable to supply the Products over a period of more than fifteen days. Titled "Alternate Supplier," section 8.2 states:

> [I]n the event Reforma is unable to supply, directly or indirectly, JoySuds for a period of more than fifteen (15) days, whether due to circumstances beyond its control, or for any other reason, JoySuds may, without limitation of any other rights or remedies JoySuds may have if such inability is due to a breach of this Agreement, purchase from a third party designated by JoySuds or manufacture for its own benefit the Products, during the remaining term of this Agreement, until such time as Reforma can resume supplying JoySuds in a timely manner with all the Products that Reforma is obligated to furnish JoySuds under this Agreement.

*Id.* § 8.2. If Reforma were "unable to supply JoySuds" for "a period of thirty (30) days, for whatever reason, then JoySuds may terminate this Agreement upon notice to Reforma." *Id.*

Several warranties provided by Reforma are relevant to this motion. Reforma warranted that "at the time of pick-up or delivery of [the] Products, the Products shall strictly conform to all Specifications, not be misbranded or adulterated and be free from defects in material and workmanship." *Id.* § 9.1(b). Reforma warranted further that "the Products shall be manufactured

and labeled in strict compliance with the Specifications and in a good and workmanlike manner at quality levels consistent with industry standards." *Id.* § 9.1(c). Additionally, Reforma warranted that it "has the capacity and ability to produce the Products in the quantities and forecasts as set forth herein." *Id.* § 9.1(i).

Section 13 sets out the various means available to the parties to terminate the Supply Agreement. The agreement could be terminated by either party

> upon default or breach of obligations or warranties of the other Party, by giving the other Party written notice of its intention to so terminate, which notice shall specify the subject default or breach in reasonable detail and such termination shall become effective thirty (30) days from the receipt of such notice by the notified Party, provided that such default or breach is not cured by the notified Party, to the reasonable satisfaction of the notifying party, within that time, a later time not longer than forty-five (45) days if such breach cannot reasonably be cured within such time to cure, so long as the breaching Party has taken commercially reasonable measures to implement such cure and pursues such measures to a full cure (as determined by the non-breaching party), or a later time agreed upon by the Parties In Writing.

*Id.* § 13.1(a) (emphasis omitted). Additionally, the agreement could be terminated "by either Party by giving the other Party written notice of its intention to terminate which shall become effective one hundred and twenty (120) days from the receipt of such notice by the notified Party." *Id.* § 13.1(c).

Section 16 includes a series of miscellaneous provisions. The Supply Agreement "shall be interpreted in accordance with, and governed by, the laws of the State of New York without regard to its conflict of law principles." *Id.* § 16.2. The Supply Agreement further "may not be modified orally, and no modifications or any claimed waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by the Party against whom such modification or waiver is sought." *Id.* § 16.5. Finally, the Supply Agreement mandates that "notices, consents, and other communications required or permitted by this Agreement shall be in writing" and

delivered to specific persons either by hand, by "nationally recognized overnight courier service with signature on delivery requested," "by facsimile with telephonic confirmation" or "by certified mail, return receipt requested." *Id.* § 16.8.

On April 6, 2021—the same day the Supply Agreement went into effect—the parties also entered into a rider to the Supply Agreement that recognized a Surge Temporary Price Adjustment (the "Price Surge Agreement"). Counterclaims ¶ 40. That agreement recognized, *inter alia*, that Reforma had "incurred an industry-wide systemic material price increase that will result in a temporary increase of the Base Price" established in the Supply Agreement, that Reforma had "provided JoySuds notice of such material increase," that Reforma provided "sufficient documentation establishing such industrywide systemic material increase," and that the price increase "shall not result in a permanent increase in the Base Prices" but that the adjustment would be "temporary," would be "reevaluated monthly," and would be "readjusted back to the Base Price" once the "cost, charge or fee normalizes." *Id.* ¶ 41.

Despite the optimism expressed in the Price Surge Agreement, "Reforma's manufacturing prices never 'normalized' as defined in the Price Surge Agreement." *Id.* ¶ 42. Instead, Reforma faced "unprecedented supply chain and labor issues throughout the life of the [Supply Agreement]." *Id.* Reforma raised prices again on "multiple occasions following the execution of the Price Surge Agreement." *Id.* ¶ 44. JoySuds "expressly consented" to each increase and continued submitting purchase orders which reflected the changed pricing. *Id.* ¶ 45. In June 2021, Reforma informed JoySuds that it needed to increase prices, Reforma "provided JoySuds documentation supporting the increases," and "JoySuds consented to them." *Id.* ¶¶ 46-47. Other price increases followed in September 2021 and November 2021 and while Reforma does not allege that it provided documentation for these subsequent increases, it does allege that JoySuds

ultimately accepted them.  *Id.* ¶¶ 48-52.  A batch of JoySuds purchase orders sent to Reforma in January 2022 stated that "All will have QTR 1 2022 pricing applied," while all subsequent purchase orders also reflected these increased prices.  *Id.* ¶¶ 52-53.

Also in 2021, "serious labor constraints" caused Reforma to be "unable to timely produce certain requested quantities" of one of JoySuds's products.  Am. Answer ¶ 95.  Reforma contends that, upon encountering these labor constraints, it "in good faith offered to find alternative manufacturing options for certain products."  *Id.* ¶ 94.  JoySuds sent Reforma an email on October 20, 2021 stating that "all of this mess is due to your lack of production."  Am. Compl. ¶ 96 (internal quotation marks omitted).  Reforma replied a few days later saying, "we will try to protect the other sizes as much as possible" and "[w]e will do everything we can so you don't miss PO and in turn we don't miss any either."  *Id.* ¶ 97.

Sometime in "late January of 2022" Reforma was informed that JoySuds "was involved with new manufacturers and apparently intended to transition its business from Reforma." Counterclaims ¶ 54.  This "shocked" Reforma.  *Id.* ¶ 55.  Reforma then "pressed JoySuds for confirmation that it was not intending to transition to other manufacturers" and JoySuds "suggested that business should continue as usual."  *Id.* ¶¶ 56-57.  Reforma subsequently learned that JoySuds had in fact entered into a supply agreement with another manufacturer in January 2022.  *Id.* ¶ 58.

Around that same time, "JoySuds became chronically delinquent in making payments" leading Reforma to repeatedly inquire about late payments.  *Id.* ¶ 59.  On February 2, 2022, for example, Reforma emailed JoySuds about fifteen past due invoices.  *Id.* ¶ 60.  Though JoySuds then paid these invoices, it "quickly fell behind again," and Reforma worked to recover on these invoices throughout February and March 2022, including by sending JoySuds "account statements" reflecting the past and currently due invoices.  *Id.* ¶¶ 61-69.

8

By April 2022, JoySuds had yet to pay forty-three overdue invoices. *Id.* ¶ 70.  On April 4, 2022, a JoySuds representative informed Reforma that JoySuds would send payment for twelve of these invoices.  *Id.*  Throughout this period, JoySuds "progressively reduced the volume of its orders to Reforma" and Reforma again learned that JoySuds was "dealing with other manufacturers." *Id.* ¶ 71.

Reforma provided JoySuds a notice of termination on April 4, 2022. *Id.* ¶ 73.  That notice listed thirty-one past due invoices and specified the number of days delinquent each invoice was. *Id.* ¶ 75.  Reforma stated that it had "PO's for materials ordered for Joy" that it had to pay for, that would be "holding further shipments until all past due amounts are paid in full or an agreed payment plan is in place," and that Reforma would be "happy to resume shipments" "[o]nce full payment is received or an agreed payment plan is in place." *Id.* ¶ 74.

JoySuds responded to this notice that same day with an email saying, "[o]k then you can swim in my receivables and inventory – and we'll see you in court." *Id.* ¶ 78 (emphasis omitted). Three days later, on April 7, 2022, JoySuds sent Reforma a "small payment . . . which was initiated before the [t]ermination [n]otice was served." *Id.* ¶ 80.  Following that payment, Reforma informed JoySuds that it owed $2,194,288.64 for "product that had already been picked up by JoySuds." *Id.* ¶¶ 80-81.

Reforma later learned that JoySuds was "continuing to sell Reforma's product to public-facing channels, which had shipped in March 2022, which JoySuds never paid for." *Id.* ¶ 84. Other product which JoySuds was selling at this time was manufactured by other manufacturers and contained labels "which reflected packaging dates that, on information and belief, meant that the purchase orders to those manufacturers were placed" before Reforma sent its termination notice. *Id.* ¶ 85.

In addition to the overdue invoices, JoySuds has allegedly failed to pay Reforma for "finished product and other residual materials held for its account upon termination," worth "well over one million dollars." *Id.* ¶¶ 87, 89.

## B.   Procedural History

JoySuds initiated this action in the Supreme Court of the State of New York, New York County, on April 7, 2022.  Dkt. 1 at 1.  Reforma removed the litigation to federal court in this District on May 10, 2022.  *Id.*  Reforma answered the Complaint and filed Counterclaims on June 24, 2022, Dkt. 25, and moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), with respect to JoySuds's claims on June 27, 2022, Dkt. 27.  JoySuds then filed the Amended Complaint on July 15, 2022, alleging breach of contract, negligence, and tortious interference with business relations.  Am. Compl. ¶¶ 110-54.  The Court dismissed without prejudice Reforma's motion for judgment on the pleadings as moot, since that motion concerned the prior Complaint.  Dkt. 33.  Reforma filed its Amended Answer and Counterclaims on July 29, 2022.  Then, on August 1, 2022, Reforma moved again for judgment on the pleadings, seeking dismissal of the Amended Complaint.  Dkt. 39.  The Court also resolves that motion today in a separate Opinion and Order.

Reforma brings four counterclaims against JoySuds:  three for breach of contract and one for breach of the implied covenant of good faith and fair dealing.  Counterclaims ¶¶ 91-113.  The first breach of contract claim (the "Payment Breach Counterclaim") alleges that JoySuds, in violation of section 5 of the Supply Agreement, has failed to pay Reforma for goods that Reforma provided.  *Id.* ¶¶ 91-96.  The second breach of contract claim (the "Materials Breach Counterclaim") alleges that JoySuds, in violation of section 4.5 of the Supply Agreement, has failed to pay for materials and products held by Reforma on JoySuds's behalf.  *Id.* ¶¶ 97-102.  The

third breach of contract claim (the "Exclusivity Breach Counterclaim") alleges that JoySuds, in violation of section 8.2 of the Supply Agreement, improperly ordered product from manufacturers other than Reforma.  *Id.* ¶¶ 103-08.  And Reforma's fourth counterclaim, for breach of the implied covenant of good faith and fair dealing, alleges that JoySuds executed a plan to force Reforma to terminate the Supply Agreement so that JoySuds could make purchases from other manufacturers. *Id.* ¶¶ 109-13.

JoySuds moved to dismiss all four counterclaims on August 1, 2022.  Dkts. 39-40, 41 ("Motion").  Reforma opposed the motion on August 23, 2022.  Dkts. 53 ("Opposition"), 54. JoySuds filed its reply on September 2, 2022.  Dkt. 57.

## II.  Standard of Review

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  *Town & Country Linen Corp. v. Ingenious Designs, LLC*, No. 18 Civ. 5075 (LJL), 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020) (quoting *Orientview Techs. LLC v. Seven For All Mankind, LLC*, No. 13 Civ. 538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual

allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009) (citation omitted).

### III.  Discussion

**A.      The Payment Breach Counterclaim**

The essence of the Payment Breach Counterclaim is that Reforma produced and provided finished products to JoySuds, which JoySuds then failed to pay for.  Counterclaims ¶¶ 91-96.  JoySuds makes several arguments as to why this claim fails.  First, it argues that Reforma has insufficiently alleged which invoices JoySuds failed to pay.  Motion at 11.  Second, JoySuds argues that Reforma has failed to adequately plead its own performance.  *Id.* at 12.  Third, JoySuds argues that Reforma was in breach of the Supply Agreement itself.  *Id.* at 14-15.  Fourth, JoySuds argues that Reforma's termination of the Supply Agreement was unlawful as it failed to provide an opportunity to cure, and therefore JoySuds cannot be in breach of that agreement.  *Id.* at 16-17.  And fifth, JoySuds argues that Reforma waived its right to object to late payments by routinely receiving payments late.  *Id.* at 17-19.

To the first point, Reforma has alleged that, on April 4, 2022, it provided JoySuds a notice of termination which stated in part "there are still 31 invoices past due" and that "Joy now owes Reforma nearly $2 million, more than $1.2 million of which is past due."  Counterclaims ¶¶ 73-74.  That same termination notice "listed 31 past-due invoices, and identified how many days past the 'net 30' payment deadline each invoice was delinquent."  *Id.* ¶ 75.  These are sufficient allegations to survive a motion to dismiss.[3]

---

[3] In support of its argument that Reforma must allege "specific invoices that were outstanding, when they were due, which payments were late, and the amounts of each," JoySuds cites to *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637 (S.D.N.Y. 2008).  Motion at 11.  Reforma's reliance on *Arma* is misplaced.  In that case, the plaintiffs merely alleged that the defendants "failed

JoySuds's arguments that Reforma failed to sufficiently allege its own performance and that Reforma itself breached the Supply Agreement require essentially the same analysis. "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Invs. Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir. 1998) (internal quotation marks omitted). "The measure of whether a party has adequately performed under a contract is substantial performance." *Express Freight Sys. Inc. v. YMB Enters. Inc.*, No. 20 Civ. 186 (ARR) (LB), 2022 WL 3682294, at *9 (E.D.N.Y. Aug. 25, 2022); *see also Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17 Civ. 1898 (AJN), 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021) ("In order to recover for breach of contract, a party must first show it substantially performed under that contract."). Further, "[t]he question of substantial performance is usually one of fact and should be decided as a matter of law only where the inferences are certain." *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 312 (2d Cir. 2016) (internal quotation marks omitted). JoySuds's accusations that Reforma's pleadings show that Reforma itself breached the Supply Agreement are relevant to this analysis because "[m]aterial breach and substantial performance are two sides of the same coin." *Pub. Art Fund v. Titon Builders, Inc.*, No. 13 Civ. 7620 (PAC), 2016 WL 3685086, at *5 (S.D.N.Y. July 5, 2016); *see also Bernard v. Las Ams. Commc'ns, Inc.*, 84 F.3d 103, 109 (2d Cir. 1996) ("A finding that Bernard's conduct in representing LAC materially breached his contract with LAC, however, is equivalent to a finding that Bernard did not substantially perform under the contract." (citing John D. Calamari & Joseph M. Perillo, *Contracts*

---

to make timely payments and failed to properly account to Plaintiffs." *Arma*, 591 F. Supp. 2d at 643 (internal quotation marks omitted). As stated, Reforma has alleged more than just that "JoySuds is in breach of its obligation [] to pay Reforma for finished product." Motion at 11 (alteration in original) (quoting Counterclaims ¶ 94).

§ 11-18, at 461-62 (3d ed. 1987) ("Substantial performance is the antithesis of material breach. If it is determined that a breach is material, it follows that substantial performance has not been rendered." (brackets omitted)))); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552 (S.D.N.Y. 2014) ("[A] party can enforce a contract as long as he has not committed a material breach."). Further, "[u]nder New York Law, for a breach of contract to be material, it must go to the root of the agreement between the parties" such that it "defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (internal quotation marks omitted).

The relevant questions are therefore whether Reforma has pleaded that it substantially performed under the Supply Agreement and whether Reforma has pleaded that it materially breached the Supply Agreement. These two questions are, of course, really the same question.

JoySuds makes a series of arguments to this point. First, it claims that Reforma has failed to allege that it "followed the procedures required for a price increase thereby making the invoices invalid." Motion at 12. In particular, JoySuds argues that Reforma failed to allege that it provided sufficient documentation for its price increases, *id.*, failed to adequately allege that JoySuds consented to the price increases because those allegations conflict with other portions of its pleadings, *id.* at 13, and failed to adequately allege that manufacturing prices never "normalized," *id.*

As an initial matter, Reforma's allegations of its performance of the agreement with respect to its manufacturing and sale obligations are sufficient. Reforma alleges that it "adequately performed all of its duties under the Supply Agreement," Counterclaims ¶¶ 93, 99, 105, along with allegations that establish "sufficient factual matter from which the Court can infer that [the relevant party] performed under the relevant agreement," *Boustead Sec., LLC v. Leaping Grp. Co.,* No. 20

Civ. 3749 (VEC), 2021 WL 3774116, at *3 (S.D.N.Y. Aug. 25, 2021).  In particular, Reforma alleges that it "manufactur[ed] and [sold] goods to JoySuds," of which JoySuds "indisputably and unqualifiedly accepted delivery," Counterclaims ¶ 2; that "until the Termination Notice was served, JoySuds never claimed that Reforma's outstanding invoices were invalid, were not overdue, or that JoySuds did not owe the amounts identified therein," *id.* ¶ 6; and that, even after the price increases, "JoySuds continued submitting purchase orders to Reforma that reflected these increased prices," *id.* ¶ 54.  Drawing all inferences in favor of Reforma, JoySuds's continued acceptance of Reforma's inventory and invoices, as well as its continued purchases from Reforma, are sufficient to allege Reforma's performance, especially since to the extent JoySuds argues that there were problems with specific products or invoices, those arguments go to the question of the extent of that performance and whether it is substantial performance, which is a question "of fact and should be decided as a matter of law only where the inferences are certain."  *Bank of N.Y. Mellon Tr. Co.*, 821 F.3d at 312 (internal quotation marks omitted); *see Korpak, Ltd. v. Williams Lea Inc.,* No. 20 Civ. 6880 (KPF), 2022 WL 375543, at *6 (S.D.N.Y. Feb. 7, 2022) (denying motion to dismiss a breach of contract counterclaim where the defendant alleged that it "at all times fully performed its obligations under the Agreement" and that it "paid for all goods supplied by Plaintiff, including full payment for the Invoices" (brackets and ellipsis omitted)); *Khmaladze v. Vorotyntsev*, No. 16 Civ. 8029 (GHW), 2019 WL 1746006, at *5 (S.D.N.Y. Apr. 18, 2019) (holding allegation of performance adequate where the party "allege[d] that it performed its obligations" and "explain[ed] how it did so").

The Court next turns to JoySuds's argument that Reforma failed to allege that it complied with the procedures for raising prices.  Motion at 12-13.  Such price increases were governed by section 5.2.2 of the Supply Agreement.  The provision states that if Reforma "incur[ed] any

industry-wide systemic material increase or decrease in a specific cost, charge, or fee beyond its control of the Base Price," Reforma would provide JoySuds "immediate notice of such material increase or decrease" and "sufficient documentation establishing such industry-wide systemic material increase or decrease." Supply Agreement § 5.2.2. JoySuds would then have thirty days "to review the documentation and take sufficient steps to verify the same." *Id.* Next, "[t]hereafter, if there is a material increase or decrease, the parties shall cooperate in good faith to determine the resulting dollar-for-dollar impact of such increase or decrease on the Base Price." *Id.* Under this provision, any price adjustment would "not result in a permanent increase or decrease in the Base Price," the adjustment would be "reevaluated monthly," and the price would be "readjusted back to the Base Price . . . once the cost, charge or fee normalizes." *Id.*

Reforma alleges that at the time the Supply Agreement went into effect, the parties also entered into the Price Surge Agreement, Counterclaims ¶ 40, and that "the Parties formally agreed in April of 2021 that Reforma was incurring systemic price increases and had provided sufficient documentation to that effect," *id.* ¶ 42. Reforma further alleges that it "was ultimately forced to increase JoySuds' prices on multiple occasions," that JoySuds "consented to the increase" "[o]n each such occasion," and that JoySuds "continued submitting purchase orders that reflected the revised pricing without any reservation of rights." *Id.* ¶ 45. While Reforma does allege that JoySuds "expressed . . . dismay" at the price increases and would try to resolve their underlying source, that allegation is not inconsistent with JoySuds's consent to the increases. *Id.* ¶ 48.

These allegations are sufficient to plead Reforma's performance under section 5.2.2 of the Supply Agreement. First, especially given that Reforma alleges that JoySuds consented[4] to the

---

[4] JoySuds argues that Reforma's allegations of consent are in "significant tension with its allegations admitting that JoySuds objected to price increases and felt taken advantage of" and

increases, there is a question of fact as to whether any failure to comply with the price increase procedure set forth in section 5.2.2 would constitute a material breach of the agreement. Second, there is a further question of fact as to whether JoySuds, by its consent to the price increases and continued submission of purchase orders, waived strict compliance with the price increase procedure. "A breach of contract may be waived by the non-breaching party." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 584-85 (2d Cir. 2006) (citing *N.Y. Tel. Co. v. Jamestown Tel. Corp.*, 26 N.E.2d 295, 297 (N.Y. 1940)). Waiver "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) (internal quotation marks omitted). "The intent to waive is usually a question of fact." *Beth Israel Med. Ctr.*, 448 F.3d at 585 (alterations and internal quotation marks omitted). And while the Supply Agreement contains a no-waiver clause, Supply Agreement § 16.5, under New York law "the mere existence of [a no-waiver clause] does not preclude waiver of a contract clause," *Morrison v. Buffalo Bd. of Educ.*, 741 F. App'x 827, 830 (2d Cir. 2018) (internal quotation marks omitted) (vacating dismissal of a breach of contract claim where the plaintiff pled allegations from which it could be plausibly inferred that the defendants waived a contractual provision despite existence of no-waiver clause).[5]

---

further that documentary evidence establishes that "JoySuds strenuously objected" to the price increases. Motion at 13 (internal quotation marks omitted). But the allegation cited by JoySuds states that JoySuds "accepted Reforma's revised price but expressed [its] dismay that the supplier was 'clearly . . . trying to take advantage of us.'" Counterclaims ¶ 48 (ellipsis in original). This allegation is not in tension with Reforma's allegations of consent to the increases. And notwithstanding the question of whether the Court can properly consider the "documentary evidence" pointed to by JoySuds, those materials on their faces would not conclusively reflect a lack of consent to any of the particular price increases. *See* Dkts. 40-3, 40-4.

[5] The Court does not reach whether Reforma in fact violated the price increase procedures set forth in section 5.2.2. Under New York Law, a court interpreting a contract must first determine

JoySuds next argues that several other breaches of the Supply Agreement by Reforma, demonstrated by Reforma's allegations, defeat Reforma's claims.   First, JoySuds argues that Reforma's allegations show that it "admittedly failed to provide Products that met the Specifications," second, that Reforma "fail[ed] to have proper capacity in violation of [section 4.2 of the Supply Agreement]," and third that Reforma "fail[ed] to make products available for pick-up by JoySuds' logistics partner in violation of [sections 2 and 13 of the Supply Agreement]." Motion at 14.   Each of these arguments fails as well.

JoySuds points to an email sent from Reforma on November 18, 2021 to support its claim that Reforma "admitted[]" to a failure to provide on-specification products.  *Id.*  That email states that a raw material, propylene glycol, was "just not available anywhere," and continues by saying that Reforma had "purchased all the PG that was available with one of our vendors" and ultimately states that the "price point for this raw material has also gone up incredibly" to "$8.42." Counterclaims ¶ 51.  The email further notes that "SLS and SLES has gone up very high in price as they have more than doubled in cost."  *Id.*  JoySuds argues that this email shows that Reforma "violated the Specifications because it used SLS (not Propylene Glycol)."  Motion at 14.  But while ultimately evidence in this case may bear out that Reforma substituted "SLS" for propylene glycol

---

if a contractual provision is ambiguous.  *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001).  "Where 'the parties' intent is unambiguously conveyed by the plain meaning of the agreements, . . . interpretation is a matter of law.'"  *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 13 (2d Cir. 2019) (alteration in original) (quoting *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999)).  The plain terms of section 5.2.2, however, could be read as either (1) requiring documentation for every new material increase or decrease in a specific cost, but not for the subsequent monthly reevaluations or (2) requiring documentation for both the initial increase or decrease as well as for every thirty-day reevaluation period.  Because of these competing reasonable interpretations of the contractual language, it would not be appropriate to decide the correct one at the motion to dismiss stage.

for some product, and that such a substitution violated the Supply Agreement, this vague email does not establish those facts, especially while drawing all inferences in Reforma's favor.

JoySuds argues next that Reforma "admits that it failed to have proper capacity in violation of Paragraph 4.2," increased prices in violation of the agreement, and admitted to being unable to produce one type of product, the "5-gallon SKU."  Motion at 14.  None of JoySuds's citations in its brief point to an admission by Reforma that it "failed to have proper capacity."  The Court has already addressed the price increases *supra*.  And the question of whether a failure by Reforma "for a period of time . . . to produce certain requested quantities of the 5-gallon SKU," Am. Answer ¶ 95, one of the twelve products listed on Exhibit A to the Supply Agreement, constitutes a material breach is not one for a motion to dismiss in this case.  *See Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) ("[T]he question of the materiality of a breach is usually a question of fact and should be decided as a matter of law only where the inferences are certain." (internal quotation marks omitted)).

JoySuds further argues that Reforma admitted in its original answer that it "did not allow JoySuds' logistics provider to pick up certain shipments on JoySuds' behalf."  Motion at 14 (internal quotation marks omitted).  The full text of that admission, however, was that "Reforma did not allow JoySuds' logistics provider to pick up certain shipments on JoySuds' behalf *after Reforma provided JoySuds with a notice of termination* of the Supply Agreement resulting from JoySuds' default of its payment obligations."  Dkt. 25 ¶ 51 (emphasis added).  This argument blends into JoySuds's next assertion, which is that Reforma's termination of the Supply Agreement was improper because it did not provide an opportunity to cure, and therefore JoySuds cannot be in breach of the Supply Agreement.

19

When a party terminates a contract without abiding by a notice-and-cure provision, two issues arise. The first is whether the termination itself constitutes a material breach that prevents the terminating party from recovering under the contract at all. The second is whether the terminating party can recover for a specific breach for which it did not provide a cure period. The allegations regarding the termination notice at issue here are somewhat vague. While the notice allegedly stated that Reforma "will be holding further shipments until all past due amounts are paid in full or an agreed payment plan is in place," it also allegedly stated that "[o]nce full payment is received or an agreed payment plan is in place, we will be happy to resume shipments and work with you cooperatively to wrap things up as we have thus far," while also inviting JoySuds to "call [Reforma] to work out a firm payment plan that works for us both." Counterclaims ¶ 74. Assuming *arguendo* that Reforma improperly stated it would withhold shipments in non-compliance with the provisions of the Supply Agreement, the notice is unclear as to what would happen if JoySuds set up a payment plan or paid its invoices. Nor do any subsequent acts of the parties help in understanding the notice, because immediately after Reforma sent it, JoySuds allegedly responded, "Ok then you can swim in my receivables and inventory – and we'll see you in court," *id.* ¶ 78 (emphasis omitted), before commencing this litigation three days later, *id.* ¶ 83.

These factual difficulties go not to the impropriety of the notice itself, which may have improperly threatened to withhold shipment at least temporarily, but rather to the materiality of the breach that the notice constituted. To be sure, improper termination can constitute a material breach that prevents the terminating party from suing on the contract. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727-28 (2d Cir. 1996) (affirming the district court's determination that a party's failure to abide by a contract's notice provision for termination constituted a material breach of that contract which therefore barred counterclaims under the contract). But here the

materiality of any breach caused by improper termination is unclear.  In particular, it is unclear whether Reforma's threat to withhold shipment until JoySuds paid past due invoices or established a payment plan would "defeat[] the object of the parties in making the contract," *Frank Felix Assocs.*, 111 F.3d at 289, especially when the Supply Agreement contemplated circumstances in which Reforma might be unable to supply JoySuds, Supply Agreement § 8.2.  As with the other supposed breaches pointed to by JoySuds, the Court declines at the motion to dismiss stage to determine that Reforma's termination notice constituted a material breach barring Reforma from bringing its claims.

This is especially true in this case where there is a real question as to whether any notice period would have been futile.  "Futility is found only in limited circumstances, which include where the non-performing party (1) expressly repudiated the parties' contract or (2) abandons performance thereunder."  *Drapkin v. Mafco Consol. Grp., Inc.*, 818 F. Supp. 2d 678, 689 (S.D.N.Y. 2011) (internal quotation marks omitted).  Reforma alleges that, at the time that it sent the termination notice on April 4, 2022, JoySuds had failed to make payments at least since February 22, 2022.  Counterclaims ¶¶ 61-69.  Also, on April 4, 2022, JoySuds agreed to pay only 28% of its defaulted obligations, despite a clear contractual provision requiring payment of all invoices within thirty days.  *Id.* ¶ 70; Supply Agreement § 5.2.1.  Further, Reforma alleges that it learned that JoySuds had improperly begun purchasing from other manufacturers.  Counterclaims ¶ 71; *see infra* III.B.  These alleged facts, combined with JoySuds's continued insistence that the outstanding invoices are "invalid," Motion at 12, raise further factual questions as to whether JoySuds had sufficiently abandoned its performance under the Supply Agreement as to make any notice-and-cure futile, in which case the termination notice would have been valid.

In addition, courts have regularly held that notice-and-cure provisions which do not specifically state that they set forth prerequisites to suit do not in fact create conditions precedent to breach of contract litigation. *See Scores Holding Co. v. SCMD LLC*, No. 18 Civ. 11364 (PGG), 2020 WL 4735198, at * 5 (S.D.N.Y. Aug. 14, 2020) (collecting cases); *see also EDF Renewable Dev., Inc. v. Cnty. of Suffolk*, 693 F. App'x 42, 43 (2d Cir. 2017) ("[I]n the circumstances presented, EDF's failure to give the County a formal notice of the breach did not preclude it from bringing suit."). The Supply Agreement contains no clear language making a cure period a pre-condition to litigation. Supply Agreement § 13.1. The Court therefore determines that this argument is not a proper basis to grant JoySuds's motion to dismiss.

Finally, JoySuds argues that Reforma waived its right to object to late payments by routinely accepting late payments. Motion at 17-19. "Waiver occurs when a plaintiff with 'actual knowledge' of a breach 'continues to perform under and accepts the benefits of a contract.'" *Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*, No. 11 Civ. 2589 (JPO), 2012 WL 4474587, at *2 (S.D.N.Y. Sept. 28, 2012) (quoting *Sauer v. Xerox*, 5 F. App'x 52, 56 (2d Cir. 2001)). "Questions of whether the right to sue has been waived are particularly fact intensive because 'the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish her known right." *Id.* (quoting *Beth Israel Med. Ctr.*, 448 F.3d at 585). For that reason, "New York law contains a general rule that questions of waiver are not decided on a motion to dismiss," unless "waiver is clear on the face of the complaint, in which case the plaintiff's waiver can be determined as a matter of law." *Id.* at *3 (internal quotation marks and ellipsis omitted).

Here, JoySuds's waiver argument fails for two reasons. First, despite accepting late payments, Reforma alleges that it continuously sought answers from JoySuds as to when payments would be forthcoming, undermining any manifestation of intent by Reforma to relinquish its right

to timely payment and at the very least rendering the issue unsuited for a motion to dismiss. Second, the Supply Agreement contains a clause stating that "no modifications or any claimed waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by the Party against whom such modification or waiver is sought."  Supply Agreement § 16.5.  While, as noted *supra*, under New York Law "the mere existence of a [no-waiver clause] does not preclude waiver of a contract clause," *Morrison*, 741 F. App'x at 830 (quoting *Stassa*, 999 N.Y.S.2d at 119), the clause does lend further support to the conclusion that waiver would be improperly addressed here on a motion to dismiss.

* * *

Having rejected each of JoySuds's arguments for dismissal, the Court denies the motion to dismiss Reforma's Payment Breach Counterclaim.

## B.    The Exclusivity Breach Counterclaim

Reforma alleges that JoySuds "breached its obligation to exclusively order Product from Reforma during the [Supply] Agreement's Term as required under Section 8.2."  Counterclaims ¶ 106.  Reforma further claims that JoySuds "was involved with new manufacturers and apparently intended to transition its business from Reforma" *id.* ¶ 54, "did enter into a supply agreement with another manufacturer in January of 2022" *id.* ¶ 58, and "was in fact dealing with other manufacturers," *id.* ¶ 71.  As stated, section 8.2 of the Supply Agreement, titled "Alternate Supplier" states:

> Subject to Section 4.2, in the event Reforma is unable to supply, directly or indirectly, JoySuds for a period of more than fifteen (15) days, whether due to circumstances beyond its control, or for any other reason, JoySuds may, without limitation of any other rights or remedies JoySuds may have if such inability is due to a breach of this Agreement, purchase from a third party designated by JoySuds or manufacture for its own benefit the Products, during the remaining term of this Agreement, until such time as Reforma can resume supplying JoySuds in a timely

23

manner with all the Products that Reforma is obligated to furnish JoySuds under this Agreement.

Supply Agreement § 8.2.

JoySuds makes four arguments for dismissal of this claim.  First, it argues the Supply Agreement was non-exclusive.  Motion at 21.  Second, it claims that Reforma has admitted it was unable to "comply with the Specifications" in January 2022 and "purported to terminate the Agreement refusing to supply *any* Products."  *Id.* (emphasis in original).  Third, it claims that Reforma consented to JoySuds using other manufacturers.  *Id.* 21-22.  And fourth it claims that Reforma has failed to adequately allege damages flowing from this breach.  *Id.* at 22.

JoySuds points to sections 2 and 3 of the Supply Agreement to support its argument that the agreement was "non-exclusive."  *Id.* at 21.  The relevant portion of section 2 states that "Reforma shall provide the following services with respect to the Products during the Term of this Agreement on a non-exclusive basis."  Supply Agreement § 2.  The relevant portion of section 3 states that "[t]he products to be manufactured and sold by Reform on a non-exclusive basis and purchased by JoySuds are set forth herein in Exhibit A."  *Id.* § 3.  These provisions, read in conjunction with section 8.2, do not support JoySuds's claim for non-exclusivity.  Instead, they indicate that the Supply Agreement was explicitly non-exclusive with respect to *Reforma*, such that Reforma could provide services to other purchasers, but that JoySuds could purchase from manufacturers other than Reforma only if the conditions set forth in section 8.2 were met.

Two points make this reading clear.  First, the non-exclusivity language only refers to obligations undertaken by Reforma.  *Id.* §§ 2 ("*Reforma shall provide* . . . on a non-exclusive basis" (emphasis added)), 3 ("manufactured and sold *by Reforma* on a non-exclusive basis" (emphasis added)).  Next, if the agreement were non-exclusive as to JoySuds, then the "Alternate Supplier" provision at section 8.2, which allows JoySuds to "purchase from a third party designated by

24

JoySuds or manufacture for its own benefit the Products" if "Reforma is unable to supply" JoySuds

for more than fifteen days, *id.* § 8.2, would be mere surplusage.  *See Matter of Trs. Established*

*Under the Pooling & Servicing Agreements Relating to the Wachovia Bank Com. Mortg. Tr. Com.*

*Mortg. Pass-Through Certificates, Series 2007-C30*, 375 F. Supp. 3d 441, 452 (S.D.N.Y. 2019)

("[W]hen construing a contract, surplusage is a result to be avoided.").  Why would the Supply

Agreement need to set out a condition for JoySuds using another supplier when it could do so

regardless of the condition any time it desired?  *See Int'l Bhd. of Elec. Workers v. N.L.R.B.*, 9 F.4th

63, 75 (2d Cir. 2021) ("[I]t is well settled that courts should not adopt an interpretation that leaves

a provision of a contract without force or effect."); *Lasalle Bank Nat'l Ass'n v. Nomura Asset Cap.*

*Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("In interpreting a contract under New York law, words

and phrases should be given their plain meaning, and the contract should be construed so as to give

full meaning and effect to all of its provisions." (ellipsis and internal quotation marks omitted)).

Second, JoySuds's assertions that Reforma "admits that it was unable to comply with the

Specifications" and "was unable to supply Products as per the Specifications," Motion at 21, are

incorrect, especially when Reforma's allegations are construed in its favor, as they must be at this

stage of the case.  The paragraphs of Reforma's Counterclaims that allegedly contain these

admissions concern one of Reforma's price increases.  *See* Counterclaims at ¶¶ 50, 51.  While

Reforma allegedly stated to JoySuds that a raw material, propylene glycol, was "just not available

anywhere," it continued by saying that it had "purchased all the PG that was available with one of

our vendors" and that the "price point for this raw material has also gone up incredibly" to "$8.42."

*Id.* ¶ 51.  The Court cannot read these statements as an admission that Reforma could not supply

JoySuds with product, and certainly not as admissions that any failure to supply was sufficiently

long—fifteen days—to satisfy section 8.2 of the Supply Agreement.  Instead, it appears from this

pleading that Reforma was ultimately able to secure the raw materials needed, though only at a much higher price. Nor can Reforma's termination of the Supply Agreement on April 4, 2022, Counterclaims ¶ 73, possibly constitute a failure to supply that would allow JoySuds to seek alternative suppliers *prior* to that termination, as Reforma alleges that JoySuds did.

Third, JoySuds inappropriately cites to evidence outside the Counterclaims in support of its assertion that Reforma consented to JoySuds's use of other suppliers. Motion at 21 (citing to an "Exh. I").[6] Upon a motion to dismiss, the Court can only consider documents "incorporated into the [pleading] by reference and those that are 'integral' to the complaint." *170 Mercer LLC v. Rialto Cap. Advisors LLC*, No. 20 Civ. 2496 (AJN), 2021 WL 1163649, at *2 (S.D.N.Y. Mar. 25, 2021) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "A document is integral to the [pleading] 'where the [pleading] relies heavily upon its terms and effect.'" *Goel v. Bunge, Ltd*. 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers*, 282 F.3d at 153). The email presented to the Court at Docket Number 40-12, in which a representative of Reforma appears to discuss shipping product to JoySuds after it "found out from the market-place that Joy had 2 new" manufacturers, Motion at 21-22, is not integral to Reforma's allegations that a "third-party vendor informed Reforma" of JoySuds's involvement with other manufactures, Counterclaims ¶ 54, or that it "pressed JoySuds for confirmation," *id.* ¶ 56. The Court therefore cannot consider the email and JoySuds's argument that Reforma consented to the use of other manufacturers fails at this stage.

Finally, JoySuds's claim that Reforma has failed to allege damages flowing from this breach is unconvincing. Motion at 22. Reforma alleges that, per the terms of the Supply Agreement, JoySuds was obligated to make all its product purchases from Reforma, but that

---

[6] It appears that JoySuds intended to cite to the document at Exhibit H. *See* Dkt. 40-12.

contrary to that obligation, it made purchases from other suppliers.  Counterclaims ¶ 85.  "Where a party has failed to come forward with evidence sufficient to demonstrate damages flowing from the breach alleged and relies, instead, on wholly speculative theories of damages, dismissal of the breach of contract claim is in order."  *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 446 (S.D.N.Y. 2018) (quoting *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*, 651 N.Y.S.3d 490 (App. Div. 1996) (internal quotation marks omitted)), *aff'd*, 777 F. App'x 531 (2d Cir. 2019).  This is not such a case.  Reforma's claimed breach of the exclusivity agreement resulted in JoySuds making purchases from other suppliers that it should have made from Reforma.  At this stage, that is sufficient for Reforma's claim to survive.

* * *

Accordingly, JoySuds's arguments for dismissal of the Exclusivity Breach Counterclaim fail as well.  The Court therefore denies the motion to dismiss as to that claim.

## C.    The Materials Breach Counterclaim

Reforma alleges that JoySuds breached section 4.5 of the Supply Agreement by failing to pay for residual materials and finished products upon the termination of the Supply Agreement.  Counterclaims ¶¶ 97-102.  Section 4.5 is titled "Residual Materials & Finished Products" and provides in relevant part that "JoySuds agrees to be financially responsible for, and to purchase from Reforma to the extent owned by Reforma, all raw materials . . . and finished products . . . held by Reforma or on order for the benefit of JoySuds as of the expiration or termination of this Agreement."  Supply Agreement § 4.5.  Reforma alleges that JoySuds has "baselessly repudiated that obligation and repeatedly refused to even discuss the matter," Counterclaims ¶ 87, and that it holds "Residual Materials and Finished Product" which are "worth well over a million dollars," *id.* ¶ 89.

JoySuds makes three arguments for dismissal of Reforma's Materials Breach Counterclaim. First, JoySuds argues that Reforma has failed to sufficiently identify any materials that it held for JoySuds. Motion at 19-20. Second, JoySuds again argues that Reforma has failed to plead its own performance. *Id.* at 20. Third, JoySuds argues that because it could have terminated the agreement, it is not required to pay for the materials. *Id.*

As to the first argument, Reforma has adequately alleged breach of section 4.5 by alleging that JoySuds has refused to pay for "well over a million dollars" of finished products and residual materials which Reforma has been "forced . . . to pay for and store." Counterclaims ¶ 89. These allegations are sufficient to plausibly plead breach at this stage. Reforma is not required to provide in intricate detail exactly what the materials were, their volume, or their cost to survive a motion to dismiss.

Second, the Court has already addressed Reforma's allegations of its own performance and found them satisfactory. *See supra* III.A.

Third, JoySuds claims, without citation, that, because section 4.5 of the Supply Agreement states that "[i]f JoySuds terminates this Agreement for a material and uncured breach by Reforma, as defined herein, then JoySuds shall not be required to pay for" materials, and because JoySuds "was entitled to terminate the Agreement," Reforma's claim fails. Motion at 20; *accord* Supply Agreement § 4.5. There are two flaws with this theory. The first is an obvious one: the plain text of the Supply Agreement does not say "if JoySuds *could have terminated* the Agreement" for a material and uncured breach, it would not be responsible for purchasing leftover materials and finished product; it says "if JoySuds *terminates*." Supply Agreement § 4.5 (emphasis added). Simply put, Reforma's Counterclaims and Answer do not contain an allegation that JoySuds terminated the Supply Agreement, as would be required to trigger this provision. Second, it is not

at all clear that JoySuds can even establish, based on Reforma's pleadings, that it would have been entitled to terminate the Supply Agreement and avoid payment, since any such termination would have to be for a "material and uncured breach" by Reforma.  Had JoySuds sought to terminate the Supply Agreement, Reforma of course would have been entitled to formal notification and an opportunity to cure any alleged breach upon which JoySuds relied pursuant to the agreement's terms.  JoySuds makes no allegation of such a notification or cure period; unless that occurred, JoySuds could not have rightfully terminated the Supply Agreement.[7]

* * *

Having rejected each of JoySuds's arguments for dismissal of the Materials Breach Counterclaim, the Court denies the motion to dismiss as to that claim as well.

### D.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, JoySuds argues that Reforma's claim for breach of the implied covenant of good faith and fair dealing, Counterclaims ¶¶ 109-113, must be dismissed as duplicative, because that claim is based on the same facts as its breach of contract claims, and the alleged resulting damages are "intrinsically tied to the damage resulting from the breach of the contract."  Motion at 22-25 (quoting with slight changes *Prudential Ins. Co. of Am. v. Hilton Hotels Corp.*, No. 95 Civ. 5575 (KMW), 1996 WL 340002, at *2-3 (S.D.N.Y. June 19, 1996)).

In essence, Reforma's claim for a breach of the implied covenant alleges that JoySuds executed "a bad faith plan to abuse and subvert the aims of the Supply Agreement," "extract value from Reforma," and force Reforma to terminate the agreement "so that JoySuds would have a pretext to repudiate its contractual obligations and immediately transition to alternative

---

[7] Unlike JoySuds's conduct relating to Reforma's termination, *see supra* III.A, there are no allegations that suggest that Reforma had sufficiently abandoned its performance under the Supply Agreement as to make any notice-and-cure futile.

manufacturers." Counterclaims ¶ 111. As factual support, Reforma states that JoySuds "covertly built up manufacturing capacity with alternative suppliers and . . . wrongfully ordered product from them," while still "leading Reforma to believe it would continue as the exclusive supplier." *Id.* ¶ 112. As a result, Reforma alleges that it was induced "to continue securing large volumes of raw materials." *Id.* Reforma further alleges that JoySuds "willfully fell behind on its payments for delivered Product, and placed numerous purchase orders it had no intention of paying" and "took steps to intentionally goad Reforma to provide a notice of termination" so that JoySuds could "immediately move to its new suppliers without giving Reforma the 120-day lead time" for terminating the Supply Agreement pursuant to section 13.1(c). *Id.*

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also Logfret, Inc. v. Gerber Fin., Inc.*, 559 F. Supp. 3d 348, 364 (S.D.N.Y. 2021). The flaw in Reforma's implied covenant claim is that the entirety of its alleged "scheme" is made up of breaches of the Supply Agreement for which Reforma is also seeking redress. Attempts by JoySuds to seek out other manufacturers form the basis of the Exclusivity Breach, while JoySuds's failure to pay for product is captured by the Payments Breach. Any materials Reforma purchased relying on JoySuds continuing with the Supply Agreement are likewise addressed by the Materials Breach. Therefore, this counterclaim must be dismissed.

Reforma attempts to avoid this outcome by arguing that JoySuds's "covert plan to abuse and abandon the Supply Agreement . . . itself is the offending conduct" such that this plan constitutes a factual grounding for the claim that differs from the allegations relied upon in support of Reforma's breach of contract counterclaims. Opposition at 23. But this "plan" was essentially

just a sequence of breaches, each addressed by Reforma's other claims for breach of contract. Although Reforma alleges distinct damages for this claim in the form of "substantial investments in implementing additional manufacturing capacity and developing new products for JoySuds" and "forgoing lucrative contracts with other customers," Counterclaims ¶ 56, Reforma never explains how JoySuds's "covert plan" induced these investments given that Reforma had "represent[ed] and warrant[ed] that it has the capacity and ability to produce the Products in accordance with" forecasts of need provided by JoySuds just a year prior in April 2021.  Supply Agreement § 4.2.  And while Reforma alleges that some of this investment was for "developing new products for JoySuds," Counterclaims ¶ 56, it certainly never alleges that JoySuds requested this development or that Reforma agreed to undertake it in writing, as required by section 2 of the Supply Agreement, Supply Agreement § 2 ("Reforma shall develop new processes and formulations to manufacture new products when requested by JoySuds and agreed to by Reforma in writing . . . .").  Similarly, the Supply Agreement does not give Reforma a right to collect for "forgoing lucrative contracts with other customers in light of its considerable and indefinite commitments under the Supply Agreement."  Counterclaims ¶ 56.  That agreement was not permanent, and in the event of termination, JoySuds would have been required to give Reforma only 120 days' notice. *See* Supply Agreement § 13.1(c). Given that Reforma itself terminated the Supply Agreement, it cannot complain that JoySuds terminated the agreement without giving sufficient notice such that it lost the opportunity to contract with other customers during the notice period.  To the extent that JoySuds intentionally induced Reforma to terminate the agreement through its breaches, the proper remedy, already captured by Reforma's claims for breach of contract, is to sue on the basis of those breaches.

\* \* \*

Because Reforma's claim for breach of the implied covenant of good faith and fair dealing is therefore based on the same facts as its breach of contract claims, the Court grants JoySuds's motion to dismiss that claim as duplicative.

## E.   Leave to Amend

Lastly, the Court considers whether to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Reforma has asked the Court for leave to amend its Counterclaims should the Court rule in JoySuds's favor.  Opposition at 24.  Because the Court dismisses Reforma's claim for breach of the implied covenant of good faith and fair dealing and Reforma has not yet amended its Counterclaims—and mindful that JoySuds has been given the opportunity to amend its claims in this action—the Court grants Reforma leave to amend its Counterclaims.  The Court emphasizes that Reforma should only file amended counterclaims if it is able to plead a viable, non-duplicative cause of action for breach of the implied covenant of good faith and fair dealing.

## IV.  Conclusion

For the reasons stated above, JoySuds's motion to dismiss the Counterclaims is granted in part and denied in part.  JoySuds's motion to dismiss Reforma's three counterclaims for breach of contract is denied.  Reforma's counterclaim for breach of the implied covenant of good faith and fair dealing is dismissed.  The Court grants Reforma leave to amend its Counterclaims.  In the event Reforma decides to file amended counterclaims, it must file them within thirty days of this Opinion and Order.

The Clerk of Court is respectfully directed to close the motion pending at Docket Number

39.

SO ORDERED.

Dated: March 31, 2023
       New York, New York

JOHN P. CRONAN
United States District Judge